Filed 5/27/21  P. v. Vang CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>      v.<br><br>THONG VANG,<br><br>    Defendant and Appellant. | F077581<br><br>(Fresno Super. Ct. No. F16905542)<br><br><br>**OPINION** |

        APPEAL from a judgment of the Superior Court of Fresno County.  Timothy A. Kams, Judge.

        Han N. Tran, Rebecca P. Jones, under appointment by the Court of Appeal, for Defendant and Appellant.

        Xavier Becerra and Rob Bonta, Attorneys General, Gerald A. Engler and Lance E. Winters, Chief Assistant Attorneys General, Michael P. Farrell, Assistant Attorney General, Daniel B. Bernstein and Tia M. Coronado, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

On the morning of September 3, 2016, appellant and defendant Thong Vang entered the public lobby of the Fresno County Main Jail while armed with a concealed .380-caliber semiautomatic handgun. He was on parole and had recently been released from prison after serving a lengthy term for committing multiple rapes.

The jail lobby was busy with people who were checking in to visit inmates. Defendant stood by the metal detector and refused to move when requested by the correctional officer on duty in the lobby, who then called for assistance. Correctional Officer Juanita Davila responded and asked defendant to move away from the metal detector. Defendant refused and pulled a gun. After a brief struggle, defendant fired a single gunshot into Davila's chin that shattered her jaw. Correctional Officer Toamalama Scanlan, who also responded to the lobby, tried to discharge his Taser at defendant. Defendant shot Scanlan in the head. Both Davila and Scanlan survived, but Scanlan suffered a traumatic brain injury and was left in a persistent vegetative state. Numerous officers from the Fresno County Sheriff's Department and Fresno Police Department responded to the lobby and took defendant into custody at gunpoint.

Defendant was charged and convicted of the attempted murders of Officers Davila and Scanlan, with other offenses and firearm enhancements, and five prior strike convictions. Defendant testified at trial and asserted he acted in self-defense because he believed the officers were going to harm him. He was sentenced to an aggregate term of life in prison with the possibility of parole, plus 50 years to life for the firearm enhancements, and consecutive terms of 20 years for prior serious felony conviction enhancements.

On appeal, defendant contends the prosecutor committed prejudicial misconduct in two instances: by cross-examining defendant about his prior juvenile adjudication that the court had previously excluded, and improperly appealing to the sympathies of the jury in closing argument. Next, defendant argues the court failed to fully advise him of the

sentencing consequences when he admitted the prior conviction allegations, and his admissions must be stricken. He separately argues the matter must be remanded for resentencing because the court was unaware it had discretion to dismiss the firearm enhancements at the time of the sentencing hearing, and it should have the opportunity to consider whether to dismiss the prior serious felony enhancements based on legislation enacted after the sentencing hearing was held.

Defendant further argues defense counsel was prejudicially ineffective for calling a forensic psychologist as the defense expert, because the expert diagnosed defendant with antisocial personality disorder, and asserts such an opinion severely undermined defendant's credibility when he testified at trial. Finally, defendant contends the court improperly imposed various fines and fees without determining his ability to pay those amounts.

We affirm.

**FACTS**

On Saturday, September 3, 2016, Correctional Officer Michael Hanlin was on duty at the security counter in the lobby of Fresno County's Main Jail. The lobby is a public area that is accessible through jail's outer street doors. The public may enter the lobby without having to be screened or walk through a metal detector.

Officer Hanlin and other correctional officers at the jail are employed by the Fresno County Sheriff's Department, but not all correctional officers are peace officers. The jail's correctional officers do not carry firearms inside the facility, but instead carry nonlethal weapons of batons and pepper spray. They are authorized to carry firearms when transporting inmates outside the jail.

The sheriff's department has a Security Emergency Response and Tactics (SERT) team, that is "basically the SWAT team for inside the jail" and specializes in "less lethal weapons and tactics." The SERT team members do not carry firearms, but instead carry

nonlethal Tasers and pepper ball "launchers" that discharge paintball shots filled with pepper powder.

Members of the SERT team and correctional officers may obtain firearms from the jail's locked armory only if accompanied by a sergeant.

Correctional Lieutenant Michael Porter was a sworn peace officer with the sheriff's department and supervised the daily operations of the jail's entire facility and the officers on duty. On the day of the shooting, Porter was the on-duty watch commander and the only correctional officer in the jail who was armed.

**The lobby, release vestibule, and records hallway**

On the morning of the shooting, Officer Hanlin was sitting behind the security desk, which is a blue counter in the back portion of the lobby. Hanlin was responsible for registering family members who wanted to visit inmates, and processing inmates who were being released.

From his position behind the security counter, Officer Hanlin faced the lobby and the public doors. A metal detector was located to Hanlin's left side. (A person entering the lobby through the public doors and facing the security desk would see the metal detector on the right side.) A member of the public who enters the secure part of the jail to visit an inmate has to go through the metal detector.

A person authorized to walk through the metal detector reaches a small "sally port" that leads in two directions. If the person continues straight through, he will reach a locked door to the "elevator vestibule" that leads to "Elevator Four." This elevator goes to the area where visitors meet with inmates and other secure parts of the jail.

A person who walks through the metal detector and turns left reaches a locked door to the "release vestibule." The release vestibule is a small room secured by two locked doors with glass windows that are bullet resistant but not bullet proof. The exterior door connects the release vestibule to the sally port, metal detector, and the lobby. The vestibule's interior door leads to the jail's secure interior area.

The two locked doors on either side of the release vestibule only can be opened remotely by either the officer at the lobby security desk, or the officer at the jail's central control desk (located elsewhere in the main jail). The two doors cannot be opened at the same time as a matter of security; one door has to close and lock, and only then can the other door be unlocked and opened remotely.

A person who is inside the release vestibule can look through the window and see the lobby, metal detector, and the security counter. The window in the vestibule has a small pass-through hatch to allow paperwork to be passed to an inmate being released.

On the right side of the security counter, on the opposite side of the lobby from the metal detector, is a small walkway. There is a locked door with a glass window adjacent to that walkway (the "records doors") that leads to the records and fingerprint departments. There is no metal detector in front of this door, and it is not open to the public.

## DEFENDANT ENTERS THE LOBBY

Around 8:30 a.m., a man, later identified as defendant, entered the lobby through the main doors. Defendant was wearing a black shirt, light-colored pants, and a dark cap. A security video showed that he stood in the middle of the lobby, facing the security desk.[1] There were about 15 to 20 people in the lobby who were waiting to visit inmates, and children were present.

---

[1] There were two security cameras in the lobby area. One camera was mounted behind the security counter and faced the public doors. The metal detector is visible on the left side of the screen, but the records door on the right side is not shown. This camera did not record audio. A second camera was focused only on the release vestibule and the window where inmates are processed. It did not show the lobby or the records door on the right side, but it recorded audio from the entire area.

During the investigation into the shooting, a technician merged the audio from the release window camera and synched it with the video from the lobby camera. The merged audio/video was admitted into evidence and played for the jury, and a transcript was given to the jury with the audio, identifying some of the speakers as Officer Hanlin, defendant, and Officer Davila.

Officer Hanlin was stationed behind the security counter and remained behind the counter for the entirety of this incident. At the time defendant arrived in the lobby, Hanlin was assisting a woman at the counter. He looked up and saw defendant standing next to the woman. Hanlin asked defendant if he needed assistance. Defendant said that he wanted to visit someone. Hanlin told defendant to stand in line to wait his turn. Defendant walked away from the counter.

**Defendant refuses to move away from the metal detector**

Officer Hanlin returned to his duties and did not pay attention to defendant. When Hanlin looked up again, defendant was standing directly in front of the metal detector on the left side of the security counter. Hanlin testified defendant's location by the metal detector was a security issue because if the exterior door to the release vestibule opened, a person standing by the adjacent metal detector could possibly enter the secure area of main jail.

Officer Hanlin told defendant that he could not stand there and needed to move. Defendant said he was not going to move, and he would rather go to jail. Hanlin told defendant that he could not arrest him, and he could go to the police department and turn himself in.[2] Defendant stayed in front of the metal detector and did not explain why he wanted to go to jail.

Officer Hanlin remained behind the security counter but called on his radio for additional correctional officers to respond to the lobby.

**Officer Davila responds to the lobby**

Correctional Officer Juanita Davila was the first person to respond to Officer Hanlin's request for assistance. She had been working in the adjacent records department on the right side of Hanlin's security desk. At approximately 8:39:55 a.m., Davila

---

**2** Officer Hanlin testified that since he was not a peace officer, he did not have the power as a correctional officer to arrest anyone unless he was turning himself in on an existing warrant.

entered the lobby; she was equipped with a baton and pepper spray. Officer Davila asked Hanlin what happened. Hanlin said, "this gentleman," referring to defendant, "just doesn't wanna comply with getting away from everything …."

**Ms. Bagby's testimony about the shooting**

The prosecution called numerous witnesses to testify about what happened next in the lobby when defendant pulled out his semiautomatic gun, fired five shots, and severely wounded Officers Davila and Scanlan. None of the witnesses previously knew or recognized defendant. Each witness had a different perspective of the chaotic events that quickly occurred, and when and how the two officers were shot.

We will review each of their accounts, beginning with Sharon Bagby, a civilian who was in the lobby that morning and waiting to visit an inmate. Ms. Bagby testified she saw defendant standing by the metal detector and talking with the officer at the security counter. The officer told defendant that he had to move. Defendant said he wanted to go to jail, and the officer said he was not going to jail and had to move. Defendant's hands were visible and not in his pants.

Ms. Bagby testified a female correctional officer (later identified as Officer Davila) approached defendant and talked to him. Ms. Bagby thought defendant appeared disoriented. Defendant repeatedly said he wanted to go to jail, and he was not going to leave. Davila told defendant that he had to leave, and defendant refused.

Ms. Bagby testified Officer Davila took defendant by the arm and tried to move him away from the metal detector. A tall, bald, Hispanic male officer arrived in the lobby from the door near the metal detector. He was not carrying a weapon. Defendant saw the male officer and walked to the other side of the lobby. Defendant put his hand into his pants, as if he was concealing a weapon. Davila followed defendant and grabbed his arm. Davila and defendant had a "small tussle with really no force" by the door to the records department.

7.

Ms. Bagby testified defendant pulled a gun from his pants and fired a shot in the air. Ms. Bagby immediately ran into the lobby restroom to hide. She could not see what else happened, but she heard additional gunshots in the lobby.

When the gunshots ended, Ms. Bagby looked into the lobby, and saw Officer Davila and a male officer (later identified as Officer Scanlan) lying on the floor, and they had been shot. Ms. Bagby saw another male officer kneeling by the metal detector (later identified as Lieutenant Porter), and he was holding a gun. She thought she heard more gunshots and ran back into the restroom. She stayed there until officers arrived and cleared the lobby.

## Officer Davila's testimony

Officer Davila testified that she responded to Officer Hanlin's request for assistance, briefly conferred with Hanlin, approached defendant, and asked him to step out of the lobby. Defendant said no, and that he wanted to go to jail. Davila said he needed to step out, and defendant again said he wanted to go to jail. Defendant walked past Davila and went to the right side of the security counter, toward the records door. She followed him, and continued to say that he had to leave, and they were not going to arrest him.

Officer Davila testified that defendant stopped in front of the records door. She again told defendant that he had to leave, and he again ignored her orders and said he wanted to be arrested and go to jail. She tried to escort him out of the lobby. "I got his left arm and I was trying to pull him so that he can start walking forward to the front door, but he was resisting." They got "into like a scuffle…. He kind of was forcing to try to stay there, and I was trying to … escort him out." Defendant continued to say that he wanted to be arrested and go to jail but did not give any explanation why he was saying that.

Officer Davila testified they were in front of the records door when defendant began to struggle with her. Davila grabbed defendant and he quickly pulled out a gun

8.

and fired a shot. Davila heard a gunshot and realized she had been shot in the neck; she believed she was wounded by the first shot fired by defendant.[3] The bullet entered below her jaw and exited through her left ear. She did not know if defendant fired more than one shot. She believed defendant shot her within five seconds of when she tried to get him to leave the lobby: "It happened very quickly."

Officer Davila fell to the floor with her back against the wall by the records door. Davila testified she likely lost consciousness and blacked out after she was shot.[4]

Officer Davila's next memory was that defendant fell down next to her. She saw wire probes on defendant's chest and believed he was hit by a Taser.

Officer Davila remained on the floor and heard "a lot" of gunshots fired in rapid succession, "one after another." She did not know if defendant or someone else was firing the shots. The people in the lobby were running and trying to hide. Davila saw Officer Scanlan lying face-down on the floor; he was not moving, and blood was coming out of his mouth.

About two or three minutes after she was shot, Officer Davila saw defendant get up, even though he had been hit by a Taser. Defendant walked to the records door, and Davila saw the glass window was broken. Defendant stuck his hands through the window as if he was going to surrender.

**The officers in the release vestibule**

Sergeant Christopher Curran heard Officer Hanlin's call for assistance and went into the release vestibule through the interior door so he could get into the lobby. Hanlin broadcast another call for assistance and 13 additional officers entered the release

---

[3] As will be explained below, defendant fired his first shot into the window of the records door and fired his second shot into Officer Davila's jaw.

[4] The videos do not show defendant shooting Officer Davila since the cameras did not cover the records door, but defendant's first two gunshots can be heard on the audio of Exhibit No. 169.

vestibule from the interior door behind Curran, including Officers Toamalama Scanlan, Eulalio Gomez, Daniel Gama, and Chelsie Bovard.

Sergeant Curran and Officer Scanlan were both members of the SERT team, and Curran was a team leader. Both Curran and Scanlan were carrying Tasers and pepper ball guns in addition to the standard equipment of batons and pepper spray. None of the officers who responded to the release vestibule were armed with firearms.

Officer Hanlin testified that Officer Davila was still talking with defendant when Sergeant Curran and other officers entered the release vestibule through the interior door.

Sergeant Curran had to wait for the other officers to get into the release vestibule behind him and close the interior door before Officer Hanlin could unlock the exterior door into the lobby.

**The officers see defendant pull a gun**

Officer Gama, who had entered the release vestibule behind Sergeant Curran, looked into the lobby through the window, and saw defendant and Officer Davila "wrestling, kind of fighting." Davila was trying to control defendant's arms. Defendant was wearing a black cap.

Officer Bovard, who was also in the release vestibule, looked through the window and saw Officer Davila struggling to restrain defendant by the records door. Defendant reached down with his right hand and pulled a gun from his abdominal area. Bovard screamed "gun" to warn everyone.

Officer Bovard testified that Officer Davila reached for defendant's gun. Defendant's arm went backwards and "[t]hat's when [defendant] shot the first initial shot, which went through the window" of the records door and shattered the glass.[5] Bovard

---

[5] The first gunshot is heard at 8:40:29 a.m. on Exhibit No. 169. Officer Davila and defendant are not visible on the video.

10.

testified that defendant fired the first shot just seconds after pulling out the gun, and everyone in the lobby was running and screaming.

Sergeant Curran testified he was in the release vestibule when he heard the first gunshot. Curran looked through the window into the lobby and saw Officer Davila and defendant on the right side of the security counter, near the records door. Defendant's right arm was across Davila's chest, and he was pointing a gun under Davila's chin. Davila was standing upright, she did not appear injured or wounded, and she was trying to break out of defendant's grasp.

Sergeant Curran used his radio to call Lieutenant Porter, the on-duty watch commander and reported there was an active shooter in the lobby and Porter needed to respond with lethal weapons. Porter did not respond.

**The officers enter the lobby**

Sergeant Curran testified that after he heard the first gunshot, the release vestibule's exterior door was unlocked, and he told the other officers to remain inside while he went into the lobby. Curran pulled out his Taser, and his plan was to incapacitate defendant so he could move forward and detain him.[6]

Sergeant Curran testified that he reached the metal detector, and defendant still had his arm around Officer Davila, and they were struggling. Curran could not get a clear shot with his Taser, but Davila moved, and Curran had an opening. Curran discharged his Taser and hit defendant with two probes, but one probe fell off his body. Curran believed defendant's gun discharged when the Taser hit him, and a shot blew out

---

[6] As will be explained below, Sergeant Curran did not realize that Officer Scanlan and other officers followed him into the lobby.

11.

the window next to the metal detector. Davila was still standing when he hit defendant with the Taser, and she did not appear shot or wounded.[7]

Sergeant Curran testified he took cover behind the security counter and reloaded his Taser and heard two or three more gunshots. Curran looked up and saw defendant, but he could not see Officer Davila. Curran was not able to get a clear view of defendant to discharge another Taser round.

Officer Bovard was still in the release vestibule and continued to watch Officer Davila struggle as she tried to control defendant and his gun. Bovard testified defendant fired a second shot, and Davila screamed and fell. Bovard yelled to the other officers that Davila had been shot.

Officer Gomez was also in the release vestibule, and he saw defendant and Officer Davila on the right side of the security counter, by the records door. Defendant held Davila in a headlock and pointed a gun at her. Gomez heard a gunshot and saw Davila go down.

**Defendant shoots Officer Scanlan**

Officer Gama testified when the release vestibule's exterior door opened, he followed behind Sergeant Curran and Officer Scanlan as they went into the sally port and through the metal detector. As soon as Gama went through the metal detector, he heard a gunshot and got down.[8] Gama testified that Curran and Scanlan were in front of him by security counter. Defendant was by the records door; Gama did not see Officer Davila. Curran pulled out his Taser and discharged it at defendant. Gama thought the Taser did not hit defendant since Curran did not rush forward and apprehend him.

---

[7] At 8:40:36 a.m. the lobby video shows an officer at the center of the security counter, trying to aim a Taser toward the right side. This person was apparently Sergeant Curran.

[8] This was likely the same shot that Sergeant Curran heard, when defendant fired his second shot that wounded Officer Davila.

Officer Gama testified Officer Scanlan was still by the security desk but behind Sergeant Curran. Scanlan pulled out his pepper ball gun and was "kind of peeking and trying to see where he could find [defendant]." Gama was not sure if Scanlan discharged his pepper ball gun.

Officer Gomez was still in the release vestibule and saw Sergeant Curran and Officer Scanlan enter the lobby. Gomez testified that after Officer Davila was shot, he saw Scanlan raise his right arm over the security counter and point his Taser at defendant. Defendant pointed his gun at Scanlan. Gomez saw Scanlan's "right shoulder, arm stretched out, totally … outward" and holding the Taser. Gomez heard two or three gunshots fired from defendant's position and saw Scanlan's "body and arm fall to the ground in an irregular manner."

Officer Gomez immediately broadcast on his radio that there was an active shooter in the lobby, officers should not respond unless they had firearms, and called for ambulances.

Sergeant Curran reviewed a photograph from the lobby video and testified that it showed Officer Scanlan crouched in front of the security counter. Scanlan's right arm was on top of the counter, and he was aiming his Taser at defendant, who was still by the records door.[9] Curran later determined that Scanlan discharged his Taser at defendant.

Sergeant Curran testified that during the entire time he was in the lobby, defendant never raised his hands or attempted to surrender.

**The video from Officer Scanlan's Taser**

The prosecution introduced Exhibit No. 225, the real-time video from Officer Scanlan's Taser. The Taser's camera became activated once Scanlan released the safety

---

[9] At 8:40:47-48 a.m. on the lobby video, an officer is in front of the security counter and trying to aim a device toward the right side; defendant's head briefly appears from the right side and that officer disappears. This officer was apparently Officer Scanlan.

on the device and prepared to fire. There is no clock on the video, but it has a timer. Exhibit No. 226 is the slow-motion version of the same video.

The video showed that Officer Scanlan was located in the middle of the security counter, and defendant was on the right side of the counter. Scanlan was directly facing defendant but lower than him, perhaps on his knees or crouching. Defendant popped up from the right side of the counter; apparently, he had been crouched in front of the records door.

The slow-motion version showed defendant had the gun in his right hand; defendant aimed the gun directly at Officer Scanlan, held the counter with his left hand as if for balance, and fired multiple shots directly at Scanlan.

The trial evidence was that defendant fired three shots at this time; two hit Officer Scanlan and one ricocheted off the counter. Defendant did not fire any more shots.

At trial, defendant was cross-examined about Exhibits Nos. 225 and 226, and testified the video showed him shooting at Officer Scanlan.

Officer Scanlan immediately dropped the Taser on the floor, and the Taser camera showed that he fell forward face-down on the floor and never moved again. Scanlan fell on top of Taser wires that had already been discharged by either Sergeant Curran and/or Scanlan. There are sounds of shots being fired from Lieutenant Porter, but he is not visible.

**The officers return to the release vestibule**

Sergeant Curran and Officer Gama went back in the release vestibule, where the other officers were still waiting. Curran ordered the officers to leave the vestibule and go back into the jail's secure area through the interior door, so defendant could not shoot them through the release vestibule's window; the officers complied with his order. Gama realized Officer Scanlan was still in the lobby.

Sergeant Curran remained in the release vestibule and tried to aim his Taser at defendant through the pass-through hatch in the vestibule window. However, Curran

14.

could not see defendant "because he threw his hat so it covered [the window hatch], and [I] had no way to get that out of the way."[10]

**Lieutenant Porter arrives and sees defendant shoot Officer Scanlan**

Lieutenant Porter, the only correctional officer on duty who was armed with a firearm, testified he was in his second-floor office and heard a radio transmission between Sergeant Curran and another officer about an incident in the lobby. There was tension in their voices and Porter realized something was going on. He armed himself with his service weapon, a .45-caliber firearm, and headed to the elevator.

Lieutenant Porter got into Elevator Four and went down to the first floor. While he was in the elevator, he heard Sergeant Curran's radio call that they "need lethal," that meant they were in a lethal, shooting-type situation in the lobby.

Lieutenant Porter testified that when he got to the first floor, he walked into the elevator vestibule and looked through the window into the lobby. Porter testified defendant and Officer Scanlan were physically engaged near the right corner of the security counter. Defendant was standing upright. Officer Scanlan "looked to be on his knees or coming up from a prone position," or possibly crouching. Scanlan was "sort of in between laying and I mean, basically it was like he was going – trying to get back up from being – from being in a laid position."

Lieutenant Porter testified that defendant was holding a small-caliber gun and trying to aim it down at Officer Scanlan. The gun barrel was just inches from Scanlan's head. Scanlan raised his hands in a defensive position and tried to divert the gun away from him.[11]

---

[10] Officer Gama testified that when he first looked through the release vestibule window, defendant was wearing a black cap as he struggled with Officer Davila. Defendant's cap was later found on the counter near the release vestibule's pass-through window.

[11] Officer Scanlan's Taser video continued to record after he dropped it on the floor. When the officers rushed into the lobby to take defendant into custody, someone

15.

Lieutenant Porter "charged" to the door that led from the elevator vestibule to the sally port, the metal detector and the lobby. He looked down to push open the door handle and heard a gunshot.[12]

After he heard the gunshot, Lieutenant Porter looked through the window and saw defendant, who was "looking at me, pointing the gun at me, and Officer Scanlan [was] on the ground…." Scanlan was lying prone on the floor in front of the security counter. Porter thought defendant had shot and killed Scanlan. Porter did not see Sergeant Curran in the lobby.

Lieutenant Porter testified that after defendant shot Officer Scanlan, defendant aimed and fired a shot at him, but Porter was not hit. Porter was in the sally port behind the metal detector, and no other officers were with him. He drew his .45-caliber service firearm from his holster and fired at defendant, who was by the records door. Porter testified he drew his weapon and fired only after he saw that Scanlan had been shot and possibly killed.[13]

Lieutenant Porter testified that defendant's head was "sticking out from – low on the counter trying to find me, and so every time his head came out I shot at [him]." Within a matter of seconds, Porter fired two rounds at defendant in the lobby. Defendant was not hit, and Porter was not sure where his shots landed. Porter fired a third round

_____

kicked the Taser so that it changed position and faced the metal detector. The video showed the door to the elevator vestibule and the elevator beyond it. The door was completely surrounded by windows and demonstrates how Lieutenant Porter could clearly see into the lobby once he walked out of the elevator.

[12] Officer Hanlin testified Lieutenant Porter could push open the door from the interior of the elevator vestibule and get into the sally port that led to the metal detector without requesting an officer to unlock it.

[13] As we will explain below, defendant testified at trial and was the only witness who claimed Lieutenant Porter was behind the metal detector and aimed his gun at him before defendant shot Officers Davila and Scanlan.

through the side of the security counter and hoped it would go through, but it did not hit defendant.

Lieutenant Porter testified defendant never raised his hands or tried to surrender during this exchange. Porter remained behind the metal detector and looked up to check defendant's location. He saw defendant's head in the records doorway. Porter fired his fourth and fifth shots toward the door's window. Porter was not sure if the window was already broken, but after he fired his fourth shot, he heard the sound of glass as it "sort of exploded, anything that was there." Porter believed his fifth shot hit the inside of the records doorway. Defendant was not hit.

Lieutenant Porter decided to move into the release vestibule to get a better angle. He called the jail's central control officer on his radio and ordered him to open the exterior door to the release vestibule; the officer did not respond. Porter then yelled for Officer Hanlin to open the door to the release vestibule and reloaded his firearm while he waited. Hanlin, who had sought cover under the security desk when the shooting started, apparently reached up and unlocked the door.

Lieutenant Porter entered the exterior door; he was the only person inside the release vestibule. Porter aimed his gun through the window hatch and waited for defendant to move into range. Porter heard a "clunk" and thought defendant threw something at him but did not know what it was.[14]

Lieutenant Porter saw defendant "peek his head through the window [of the records door] and then move his head back. And then the next thing I saw is his hands sticking up with the gun dangling from his thumb and him saying he gave up."

---

[14] Sergeant Curran testified defendant threw his hat so it covered the window hatch of the release vestibule. Defendant's cap was later found on the counter near the release vestibule's pass-through window.

17.

Lieutenant Porter testified that he did not fire another shot because defendant finally raised his hands. Porter later determined he fired five rounds from his .45-caliber service weapon.

**The other officers see Lieutenant Porter in the lobby**

Officer Gama testified that when he went back into the release vestibule from the lobby, he saw Lieutenant Porter walk out of Elevator Four and enter the sally port. Gama heard additional gunshots in the lobby, and believed Porter fired the shots since he was the only officer armed with a firearm. Gama heard defendant yell, " 'I don't want to go to jail.' " Gama testified it was hard to hear in the vestibule and conceded defendant could have said " 'Take me to jail' " or " 'I want to go to jail.' " After about one minute, the vestibule's interior door was opened and the officers who were inside the small room returned to the secure part of the jail.

Officer Bovard testified that after Sergeant Curran returned to the release vestibule, she saw Lieutenant Porter arrive from the elevator vestibule and stand next to the metal detector. Bovard testified that Porter arrived about one minute after Officer Davila had been shot. Porter pulled his weapon and Bovard heard gunfire from Porter's position. Bovard heard return fire from defendant's position by the records door. "It was an exchange of fire between both. It was just going back and forth." Bovard testified Porter was the first officer on the scene who was armed with a firearm.

Sergeant Curran testified that he never saw Lieutenant Porter, but he heard gunshots fired from by someone who was between the elevator vestibule and the metal detector.

Sergeant Curran left the release vestibule through the interior door and ran to the armory to get a firearm. He encountered additional correctional officers and led them to the back entrance to the records department. As Curran ran there, he heard a dispatch on his radio from an officer in the records department that the gunman was " 'trying to get in here.' "

Sergeant Curran entered the back of the records department and directed the officers inside the room to leave. However, the officers indicated the suspect was no longer a threat, and the incident was over.

**Defendant's arrest**

Lieutenant Porter testified that when defendant raised his hands, he ordered defendant to drop the gun eight to 10 times, but he failed to obey the orders.

A large group of officers from the Fresno Police Department and deputies from the sheriff's department responded to the dispatch that there was an active shooter in the jail lobby and an officer was down. They assembled on the street outside the jail's lobby entrance.

At approximately 8:46 a.m., Lieutenant Pursell of the sheriff's department led the officers into the lobby through the public doors with their guns and rifles drawn. Officer Scanlan was lying face-down on the floor, he was not moving, and Pursell thought he was dead. Pursell saw a figure, later identified as defendant, moving back and forth behind the broken window of the records door. Defendant said that "he had something to say, or he just wanted to get arrested." Defendant raised his hands, and he was holding a gun by its butt, upside down between his thumb and index finger.

Lieutenant Pursell repeatedly yelled at defendant to drop the gun and not move, and defendant finally dropped the gun. The officers who entered the lobby could smell the odor of pepper ball.

Several officers covered defendant at gunpoint, while another group rushed to Officers Scanlan and Davila and moved them out of the lobby. Defendant kept saying that "he wanted to be arrested, and he had something to say."

Officer Davila was conscious, but her face was blank, and she was not responsive. Officer Scanlan was heavily bleeding from his nose and mouth, and his breathing was very shallow and labored. Scanlan had been wearing both a tactical vest and a bulletproof vest. The wounded officers were transported to the hospital.

19.

Defendant was still behind the records door. Lieutenant Pursell could see defendant's hands but not the gun. Pursell ordered defendant to keep his hands visible, to use one hand to open the records door, step into the lobby, turn around, and walk backgrounds to them with his hands in the air. Defendant complied with Pursell's orders, and he was taken into custody and placed in handcuffs without further incident. None of the officers who responded through the public doors into the lobby fired their weapons.

**Additional video from Officer Scanlan's Taser**

After defendant shot Officer Scanlan, his Taser fell on the floor, but the video continued to record. Scanlan remained motionless on the floor, but the video picked up sounds of more shots being fired, apparently by Lieutenant Porter.

The video showed Officer Scanlan being moved, apparently by the officers who rushed into the lobby. One of these officers kicked the Taser on the floor, and the camera changed direction, faced the lobby doors, and showed the officers carrying Scanlan outside. The officers' voices are heard yelling at defendant not to move.

Someone again kicked the Taser, the video camera changed directions and faced the metal detector, and it showed Lieutenant Porter standing within the metal detector with his gun drawn, talking to the officers who are apparently taking defendant into custody.

**The victims' injuries**

Defendant shot Officer Davila once under her chin. The bullet entered the left side of her jaw and exited in front of her left ear, and a bullet fragment was recovered from her clothing. Her jaw was severely shattered and had to be surgically wired shut. She suffered permanent loss of some hearing in her ear. At the time of trial, she was still a correctional officer but was not working. She could not open her mouth in a normal way and suffered hearing loss in her left ear. She needed additional surgery to sever a bone that was protruding on the left side of her jaw, that would hopefully allow normal opening of her mouth.

20.

Officer Scanlan had been wearing a bulletproof vest. Defendant shot him twice. One bullet went into his left bicep. The second bullet entered his head about three inches above the right ear. It traveled deep through the brain, elevated the intracranial pressure, resulted in hemorrhages, and fractured his skull. There was an exit wound in the base of the anterior skull, near the nasal cavity

When Officer Scanlan arrived at the emergency room, he was nonresponsive and in a coma from traumatic brain injuries. He immediately went through neurosurgery and a large portion of his skull was removed because of the swelling. Scanlan became very ill with multisystem organ failure and pneumonia that persisted for several weeks after the shooting.

Officer Scanlan subsequently needed multiple surgeries and suffered permanent loss of major motor functioning and was left in a persistent vegetative state from the brain damage. He remained on a ventilator, could not speak or respond to commands, had complete left-side paralysis, and his future prognosis was poor.

At the time of trial, Mrs. Scanlan testified her husband was being treated at UCLA Medical Center and had just been moved there from another hospital because he had been suffering from seizures. He could open his eyes, but he was still on a ventilator and could not move, speak, or feed himself.[15]

**Defendant's postarrest statements**

After defendant was taken into custody, Sergeant Terrance searched him and did not find any other guns or ammunition. Defendant kept saying, "I have something to say,

---

[15] Mrs. Scanlan testified they had been married for 23 years and had six children. At the sentencing hearing, Officer Scanlan's son addressed the court and stated that his father had been moved to "countless hospitals all across the west coast, San Francisco, Texas, Denver, shuffled between hospitals all over Los Angeles. And although we are optimistic, progress is very slow."

I want to be arrested." There were no holds or outstanding warrants for defendant's arrest.

Sergeant Terrance asked defendant "how many people were hurt, and how many guns there were." Defendant said, "I shot those two cops," he had one gun, and he dropped it on the floor as ordered. Terrance asked defendant if he was hurt, and defendant said no. When Terrance placed defendant in a patrol car, defendant "was just repetitive. He just kept saying the same thing, I have something to say, and I wanted to be arrested."

Defendant was not wounded by any of the gunshots, but he had cuts on his arm and forehead, and there was blood on his palms, apparently from the broken glass. He was taken to the hospital for treatment and a blood draw. During the trip in the ambulance, defendant spontaneously said, "Just put whatever in me and finish me off. She should have just told me she loved me."

Defendant was evaluated at the hospital, and a doctor said he needed stitches on his arm and a tetanus shot. Defendant refused.

**Defendant's drug test**

It was stipulated that around 1:15 p.m., defendant's blood was drawn at the hospital. He tested positive for 0.34 milligram liters of methamphetamine and 0.02 milligram liters of amphetamine.

**Forensic evidence**

Defendant's vehicle was parked next to the police department, near the jail.

Defendant's gun was found on the floor behind the records door. It was a small Ruger .380-caliber semiautomatic handgun. The gun's magazine was empty and there was one live .380-caliber round in the chamber.

There were five expended .380-caliber casings found around the lobby floor that matched the caliber of defendant's ammunition and gun. The officers who entered the

lobby to arrest defendant and remove the wounded officers inadvertently moved the casings around the floor.

There were five expended .45-caliber casings found by the metal detector, consistent with being fired from Lieutenant Porter's position with his .45-caliber service weapon.

There was a bullet hole into the window next to the metal detector, but the glass was not shattered. There was a bullet strike and ricochet on paperwork on top of the security counter.

There were three bullet holes through the records door, the door's glass window was shattered, and six bullet-strike marks were in the wall in the records hallway. The criminalist could not determine the type of ammunition that caused the strikes and holes. Some of the trajectories were consistent with being fired from Lieutenant Porter's position by the metal detector.[16]

There was a mark on the wall by the records department that was consistent with a pepper ball strike. There were no bullet holes or strike marks in the lobby's ceiling. There were no bullet holes, strikes, casings, or ammunition found inside the release vestibule.

---

[16] In closing argument, the prosecutor stated the forensic evidence showed Lieutenant Porter fired three shots through the records door that hit the wall beyond it, and he fired a fourth shot that also went into the wall. Defendant was responsible for the other two strike marks in that wall because his first shot hit the window of the records door, that bullet split into two pieces, and both the jacket and core of the first bullet hit the wall. The prosecutor further stated defendant fired the shot that caused the ricochet mark on the top of the security counter, and Porter admitted that he fired a shot into the counter.

Deputy Scanlan's Taser gun and pepper ball gun, and an expended Taser cartridge, were on the lobby floor. One Taser probe was by the records door, and three probes and wires were on the lobby floor.[17]

### DEFENSE EVIDENCE

### Ms. Preciada

Andrea Preciada, called by the defense, testified she was walking to the jail with her husband to visit someone. As she approached the street doors to the lobby, a man (determined to be defendant) told her "not to go in there, what you need isn't in there, and pointed. 'Cause he was like leaning on the wall and pointed to the other side, and said like I think to go that way. I don't remember exactly the wording, but what you need isn't in there." She took his statement as a warning not to go inside.

Ms. Preciada ignored him and went into the lobby. Ms. Preciada later walked out of the main doors and went outside, and defendant was still there and again said something to her. Ms. Preciada's husband told her to ignore him, and they went back into the lobby.

Ms. Preciada testified she later saw the same man in the lobby by the metal detector. He said something about wanting to go in the back. She thought he ended up in the "back part … when you go get fingerprinted," and indicated on a diagram that he was by the records door. The officer behind the counter asked him to leave or stand in line. A female officer came into the lobby and told him to leave. Defendant reached into his waist, pulled out a gun, and shot the female officer. Ms. Preciado saw the female officer bleeding from the neck. Ms. Preciada's husband pulled her into the lobby restroom to hide with other members of the public, and she heard a lot of gunshots.

---

[17] The four Taser probes were discharged from the devices of Sergeant Curran and Officer Scanlan; each Taser discharged two probes.

When it became quiet, they tried to leave the restroom. Ms. Preciada saw a male officer crouched down behind the metal detector, and he was holding some type of weapon. Another male officer was lying on the floor. Ms. Preciado went back into the restroom to hide until officers escorted them out.

**Mr. Carillo**

Diego Carrillo, also called by the defense, was sitting in the lobby by the entrance doors with his children. While he waited to visit someone, he saw defendant talk to the officer behind the counter, and said that he wanted to turn himself in. Defendant stood in front of the metal detector, and a female officer told defendant that he had to move. She grabbed his arm to make him move, and defendant got loud and said several times that he wanted to be taken into custody. Mr. Carrillo saw defendant pull out a gun, he quickly fired two rounds, and the female officer was shot. Mr. Carrillo grabbed his children and ran out of the lobby door and escaped into the street.

**Officer Moore**

Correctional Officer Moore testified he responded to Officer Hanlin's request for assistance in the lobby. He went into the release vestibule with several other officers. When the outer vestibule door opened, Moore went into the lobby behind Sergeant Curran and Officer Scanlan. He stayed near the metal detector while Curran and Scanlan went to the middle of the lobby against the security counter.

Officer Moore heard someone yell, "[G]un!" Officer Davila was on the opposite side of the lobby, near the records door, and struggling with defendant, who had a gun. Moore saw defendant point the gun up into the air, then point the gun under Davila's chin. The gun was within an inch of Davila. Moore heard a shot and saw Davila go down. At some point after the gunshots, Moore heard defendant say, "I just want to go to jail."

25.

Officer Moore next saw Officer Scanlan and Sergeant Curran take out their Tasers. Moore saw Taser wires that indicated a device had been discharged, but he did not know which officer had done so.

Officer Moore went back into the release vestibule with Sergeant Curran. Moore saw Lieutenant Porter arrive in the lobby and heard additional gunshots. Porter later entered the release vestibule and pointed his firearm through the window hatch into the lobby.

## DEFENDANT'S TRIAL TESTIMONY

Defendant testified he dropped out of high school and was first incarcerated when he was 15 years old. He was released after he turned 18 years old. He was convicted of multiple counts of rape and served almost 18 years in prison. Defendant began using methamphetamine and marijuana before he went to prison, and continuously used those drugs plus heroin during his prison term.

After he was released on parole, he had two jobs and stopped using narcotics. About six months before the shooting, defendant started using narcotics again and was using daily by the date of the shooting.

Defendant testified that for two weeks before the shooting, he became increasingly paranoid about his girlfriend, and he was not sure what was real. Defendant bought his gun about two or three days prior to the shooting to defend himself from his girlfriend's friends or whoever was following him.

The night before the shooting, defendant went home after work and used methamphetamine with his girlfriend. Defendant stayed up all night using drugs and arguing with his girlfriend. In the morning, his girlfriend asked defendant to take her to a friend's house. Defendant felt paranoid and believed that his girlfriend was setting him up to be assaulted by her friends, and that her friends were driving around and parking in front of his house.

26.

**Defendant drives to the police department**

On Saturday morning, defendant dropped off his girlfriend at her friend's house, and panicked because he thought he saw the people who were following him. He decided to turn himself in and drove to the police department in downtown Fresno because he thought they would help him. He parked near the police department, walked to the door, and looked around to see if anyone was following him. He was trying to fight off his paranoia and was not sure if he was "seeing things" that were "real or not."

Defendant testified he was carrying his gun on his hip, between his pants and his body, because he thought he needed to defend himself since people were following him.

At trial, defendant reviewed a security video and identified himself as the person who walked up to the police department, tried to open the public door, and it was locked. He had not realized it was Saturday. Defendant also confirmed the video showed that he was holding something in his hand, and testified he had three working cell phones because he thought his girlfriend had "cloned" or "hacked" them.

When he discovered the police department's door was locked, he walked away and looked behind him. He still thought that someone was following him, so he started running. He wanted to find another safe place, thought about the courthouse, and realized the jail was closer.

**Defendant goes to the jail**

Also, at trial, defendant identified himself on a security video as the person who walked up to the jail's public doors. As he approached the lobby doors, he saw two people outside who were talking on a phone. He thought they were talking about him. He denied that he told Ms. Preciado not to go into the lobby, and insisted he only said to leave him alone.

Defendant testified he left his cell phones outside the jail, entered the lobby, and sat in the corner. He still felt paranoid and kept looking around to see if anyone was following him.

27.

Defendant testified he did not intend to hurt anyone. He sat there and thought about how he still had his gun "tucked in my hip," and he would get three years if he turned himself. He decided to turn himself in since he was afraid of the people who were following him.

Defendant walked back and forth in the lobby and looked outside the windows to the street to see if anyone followed him. Defendant walked to the metal detector because he thought it would be easier to see everyone in the lobby. He went to the front counter and falsely told the officer that he wanted to visit someone. Defendant testified he did not want to visit anyone but said that because he needed time to think about what to do. He kept looking outside for anyone following him. The officer at the counter told him to get in line.

Defendant stood by the metal detector two or three times. He did not think he was trying to set it off with his gun. The officer at the counter told him to move away. Defendant told the officer that he wanted to get arrested and go to jail. He thought the officer did not hear him and repeated himself. The officer said something like, "Well, go do that out there." Defendant again said he wanted to get arrested and go to jail, and eventually gave up that the officer would help him.

## Officer Davila tells defendant to leave

Defendant testified Officer Davila approached him and said he had to leave. Defendant again said he was there to get arrested. Davila repeated that he needed to leave, and she grabbed his left arm and pushed him toward the public door.

Defendant testified he "held my ground" and again said he was there to get arrested. Defendant saw officers "come from the metal detector … [and] I seen one of them draw a gun. And when they drew the gun I panicked and I ran back there" by the records door.

28.

**Defendant fires his gun**

Defendant testified Lieutenant Porter was the officer behind the metal detector, and he pulled "a big black gun." Defendant pulled out his own gun from his waist. He turned around and faced Officer Davila, and "shot out the window" in the records door because he felt "threatened by them and I wanted to do that to kind of let them know … here's a warning shot or whatever."

Defendant testified that after he shot out the window, he raised his hands in his air and the gun was "dangling on my thumb." He looked at Officer Davila and said he just wanted to go to jail.[18]

**Defendant claims Lieutenant Porter fired at him**

Defendant testified Officer Davila "ran at me." Defendant testified Lieutenant Porter was still at the metal detector and fired a shot at him. Defendant turned and looked at Porter, who was "squatted down, he had the gun like this, pointed it at me." Defendant was not hit by the shot.

Defendant testified he did not get into a gun battle with Lieutenant Porter but realized he "just tried to kill me. That's when I reacted and survival instincts kicked in." Defendant conceded the officer might have been holding a pepper ball gun and not a firearm. Defendant testified he never fired at Sergeant Curran and did not know he was in the lobby.

---

[18] Defendant identified Lieutenant Porter by name as the officer behind the metal detector who was pointing a gun at him. Defendant's testimony is inconsistent with the prosecution's evidence that Porter was the only correctional officer in the jail armed with a firearm that day; the officers who arrived to assist Officer Davila were not armed with firearms; Porter did not get to the lobby until after defendant shot both Davila and Officer Scanlan; defendant never raised his hands to surrender under after he shot Davila and Scanlan; and Porter fired multiple rounds at him.

**Defendant shoots Officers Davila and Scanlan**

Defendant testified he next took "defensive" actions. He pinned Officer Davila against the door, pushed off from her, and shot her. He shot Davila to defend himself because the other officer "snuck up and shot at me. If somebody sneaks up and shoot at me … that means that person wants to kill you."

Immediately after he shot Officer Davila, defendant turned around to face the other officer. Defendant identified this person as Officer Scanlan, and testified he turned toward Scanlan because "I knew he was already coming." Defendant brought up his gun "to face him," but Scanlan "already just charged his Taser and just flew over me. And when he did that, he ducked and dropped the gun. And that's when he rushed me."

Defendant testified that Officer Scanlan dropped his Taser, charged at him, and defendant fired two shots at him. Defendant testified Scanlan fell. Defendant turned and pointed his gun "at the lieutenant, but the lieutenant is hiding behind that glass partition, so I don't shoot" and "just kind of hide behind" the security counter.

Defendant testified he feared for his life and looked for somewhere to run and headed to the records door. He did not pay attention to whether more shots were fired at him. He used his right arm to break out the remaining glass in the door's window, cut himself, and jumped through the window into the records office. He ran around the office and looked for a way to escape. Defendant saw Lieutenant Porter in the release vestibule and threw his hat at him.

> "[Defense counsel]: Okay. So in your mind at that time you were just trying to defend yourself?
>
> "[Defendant]:     Yes.
>
> "Q     As you sit here today, how do you feel about having shot those two [correctional officers]?
>
> "A     It's like I told the detectives [after being arrested], I said, 'Man. I only came here to get arrested. I wasn't here … to get in no altercation

30.

with nobody.'  You know what I mean?  But like I said, things led up to where I am.  If somebody shoots at me, I'm going to defend myself."

Defendant testified he surrendered when the police officers arrived in the lobby. He raised his hands, dropped the gun, and followed their instructions.  Defendant was taken to the hospital, and claimed that deputies told him, "We are going to … set you up to get killed.  We are going to set you up in the jail you can get raped and murdered.' "

**Cross-examination**

On cross-examination, defendant testified he was a member of the Mongolian Boyz street gang.  He was incarcerated when he was 15 years old.  He got out in 1997 and was again incarcerated in April 1998.  Defendant testified he was convicted of multiple counts of rape in 1998 and 2000, and claimed he was "pressured into signing that deal."  He remained in custody for nearly 18 years.  He was released on parole in December 2014.[19]

Defendant admitted he started using methamphetamine before he went to prison. He lied when he told Dr. Yufik, the defense expert, that he did not start using drugs until he was in prison.

Defendant used methamphetamine on the morning of the shooting.  After he was arrested, the officers asked him for his girlfriend's name, and he intentionally gave a false name.

Defendant bought the gun two or three days before the shooting from someone on the street.  He took the gun with him when he left his home that morning.  He knew it was illegal to have a gun while he was on parole, and to take a gun into the police department or jail.

---

[19] In issue I, *post*, we will address defendant's contention that the prosecutor committed prejudicial misconduct by questioning him about his prior juvenile adjudication because the court had previously excluded this evidence.

Defendant was asked to review video from security cameras that showed him walking from the police department to the jail. Defendant agreed the video showed police cars stopped at the corner while he crossed the street. Defendant was asked why he did not flag down a police car and ask for help if he thought his life was in danger. Defendant testified he was still paranoid and was not paying attention. He did not call 911 on any of his cell phones and claimed the service was not working by the downtown buildings.

Defendant admitted that when he went into the jail lobby, he told the officer that he wanted to visit "Nhia Vang." Defendant claimed he lied and made up the name to buy time while he was thinking. In rebuttal, a correctional officer testified that "Nhia Vang" was booked into custody at the jail on August 22, 2016. This person was still in custody on the day of the shooting, September 3, 2016, and the person was released on September 28, 2016.

On further cross-examination, defendant acknowledged he could have been arrested for being a convicted felon with a gun, but did not tell the officer at the security counter that he had a gun because he was "still a member of the public" and did not want to bring "all that up." Defendant admitted he was in the lobby for 10 minutes and never told an officer that he needed help.

Defendant admitted that, in a previous statement, he said that he intentionally stood inside the metal detector and set it off with his gun " 'to make them know I was serious.' " Defendant never told Officer Davila that he was in trouble and needed help. He saw other officers in the lobby, ran to the records door, and shot out the window.

Defendant admitted that in his previous statements, he never said that he saw an officer with a firearm in the lobby. Defendant testified he "pulled the trigger" and intentionally shot Officer Davila in the face "to protect myself," and he knew Davila was unarmed. Defendant also admitted he intentionally pulled the trigger twice and shot Officer Scanlan in the head and arm. He did not see Scanlan with a gun. He only saw a

Taser; it was yellow, and he knew the Taser was not lethal. He shot Scanlan because Scanlan rushed him, and "[i]n my mind I was defending myself." Defendant knew both officers were doing their duties.

Defendant admitted that after he shot Officer Scanlan, he shouted, " '[F**]k you,' " but claimed he was cursing at Lieutenant Porter because Porter was trying to shoot him.

On further cross-examination, the prosecutor asked defendant to clarify the sequence of events. Defendant testified he shot out the window to the records door, he saw Sergeant Curran in the lobby, and Curran tried to shoot him with the Taser. Defendant then shot Officer Davila in the face. He only fired one shot at Davila because "I heard and seen she fell, so I just moved on." Defendant then turned toward Officer Scanlan, who fired his Taser at him and missed. Scanlan dropped the Taser, charged defendant, and tried to tackle him. Defendant testified he aimed his gun directly at Scanlan's face and shot him in the head because he knew Scanlan was wearing a bulletproof vest.

Defendant was asked about the video from Officer Scanlan's Taser and testified that it showed him shooting at Scanlan.

Defendant insisted that Lieutenant Porter shot at him before he shot Officers Davila and Scanlan. He denied that Porter fired at him after defendant shot Scanlan. Defendant knew Davila was unarmed and she was trying to take his gun, but he was afraid she would hold him down for the other officer. Defendant also knew Scanlan did not have a firearm and was trying to tackle him, but defendant did not know what would happen once he was tackled. He knew there was a good chance that someone shot in the face or head would be killed. Defendant admitted he never dropped his gun or tried to surrender before he shot the two officers. Defendant cleared away the glass from the broken window on the records door and jumped into the records department. He surrendered when the police arrived.

Defendant confirmed that after he was arrested, he told officers to " 'just put whatever in me,' " and meant that he was suicidal. Defendant wanted someone to kill him because the police were taking him some where he did not want to go.

Defendant also confirmed that, during a postarrest interview, he said he was not that high, his methamphetamine use made him more active, and he had just started using methamphetamine two months earlier. At trial, however, defendant testified he was high and under the influence, but did not know how high he was.

Defendant did not believe he did anything wrong that day "because at the time I believed there was cameras, and they would have caught how everything happened." Defendant admitted he was the person who started everything.

**Dr. Yufik**

Dr. Alex Yufik, a forensic psychologist, testified as the defense expert. He had both a law degree and a doctorate in clinical psychology, worked in and evaluated criminal patients in state hospitals, and was licensed in California. He conducted evaluations of individuals to determine if they were competent to testify. He had worked for the State Bar to evaluate attorneys with substance abuse or mental health problems, and for the federal government in immigration matters. He taught courses at UCLA in the psychological basis of criminal behaviors.

Dr. Yufik testified he was retained by the defense to determine if defendant had any psychological or psychiatric illness that could explain his behavior, and whether methamphetamine abuse or addiction played a role in that behavior. He prepared a report about his conclusions.[20]

---

[20] In issue 5, *post*, we will address defendant's argument that defense counsel was prejudicially ineffective for calling Dr. Yufik as a witness because it allowed the prosecution to cross-examine him about his secondary diagnosis that defendant had antisocial personality disorder.

Dr. Yufik met with defendant at the jail and conducted a clinical evaluation, administered psychological tests, and determined he was not malingering. When Dr. Yufik advised defendant about the purpose of his evaluation, defendant said he understood but "thought it was a waste of time." Dr. Yufik testified that defendant's response was significant because it showed he had "very limited insight in not only to himself, but how other people perceive him. So it's not surprising he didn't really understand what relevance his mental illness or any underlying issues involving methamphetamine abuse could have played a role in what he was charged with."

As part of the evaluation, Dr. Yufik asked defendant to write "a simple sentence" about anything he wanted. Defendant wrote, " 'I think this is all bullshit, but, hey, if it will help the case.' "

Dr. Yufik testified to his opinion that at the time of the shooting, defendant was suffering from methamphetamine abuse, he was in "a psychotic state induced by the methamphetamine," and he lost touch with and was not able to accurately perceive reality.

Dr. Yufik explained that based on the toxicology report, defendant had a particularly high level of methamphetamine in his system. A person with that level could show irrational and violent behavior, delusions, paranoia, and a diminished ability to process and understand reality. Such a person could believe whatever he was seeing, even though that was not actually true. The person could also have auditory and visual hallucinations, believe people are following or trying to kill him, and feel threatened when there is no actual threat. As a result, the person would react to what he thought was reality, and there would be an increased probability of violent and aggressive behavior.

Dr. Yufik testified he asked defendant about his methamphetamine use. Defendant said he did not use methamphetamine before he went to prison. He said he first used it while in prison, he used the drug after he was released, and he was using it daily in the month before the shooting. In Dr. Yufik's opinion, defendant's failure to

35.

admit the extent of his methamphetamine use supported the conclusion that he had a substance abuse disorder.

### *Cross-examination*

On cross-examination, the prosecutor asked Dr. Yufik if he reached two diagnoses about defendant. Dr. Yufik testified the first diagnosis was amphetamine substance use disorder and the second was antisocial personality disorder. He did not diagnose defendant with psychopathy.

The prosecutor reviewed Dr. Yufik's report about the various tests he administered to defendant as part of his examination. Dr. Yufik agreed that defendant said he did not suffer from hallucinations and delusions, and he never saw people who were not actually there. Dr. Yufik explained, however, that a person with a real mental illness "would never endorse that kind of an answer," whereas a person who did not know "what real mental illness look[ed] like" would answer in a different way.

In response to further cross-examination, Dr. Yufik confirmed that in one of the tests administered to defendant, he was asked, " 'When people do me wrong, I feel I should pay them back if I can just for the principle of things,' " and defendant said that was true.

Dr. Yufik testified that when he asked defendant about his background, defendant described "a very lengthy history of what will be termed conduct disorder issues. So this means fighting, truancy, that is skipping school, shoplifting, getting in trouble very frequently. He also joined a gang at a very early age and started to participate in all the gang-related activities."

> "[The prosecutor]     And this kind of conduct disorder prior to the age of 15, that's necessary for your finding that he … had anti-social personality disorder, correct?
>
> "A.     That's correct.
>
> "Q     That's a prerequisite for that?

"A    Yes.  [¶]

"Q    Okay.  So you wrote in your report … [defendant's psychological and behavioral difficulties began in early childhood and … could be characterized broadly as anti-social behavior and drug abuse?

"A    Yes."

Dr. Yufik testified the primary characteristics of a person with antisocial personality disorder are a disregard for the safety and concern for other people, a lack of empathy, and a failure to conform to social norms regarding lawful behavior.  Dr. Yufik described defendant as likely to become hostile and resentful when his demands are not met, to be dishonest with frequent opportunistic lying, to be rebellious towards authority, and to have little disregard for others or the opinions of society.  When such a person uses methamphetamine, the drug will exacerbate the symptoms of the disorder.

When asked about his report, Dr. Yufik testified he determined defendant was likely to engage in the personal mistreatment of others, he was self-centered, he became hostile and resentful when his demands were not met, he was dishonest with frequent opportunistic lying, he was rebellious toward authority, he was not likely to feel a great deal of responsibility for people's welfare, and he had abrupt mood changes that could turn violent.  Dr. Yufik found sufficient evidence of defendant's conduct disorder prior to the age of 15, that was a prerequisite to find anti-personality disorder in adulthood.  He had a pattern of exploiting others for his own benefit, demonstrated a callous disregard for the rights and feelings of others, he was impulsive, and he had an inability to follow or respect authority.

When defendant described the shooting, he never told Dr. Yufik that he told the officer at the desk that he wanted to visit someone.  Defendant told Dr. Yufik that he fired his first shot in the air because he thought it would be sufficient cause to arrest him, and never said he tried to surrender before he shot the two officers.

## PROCEDURAL BACKGROUND

A second amended information charged defendant with counts 1 and 2, the attempted murders of custodial officers while engaged in the performance of their duties as to, respectively, Officers Davila and Scanlan (Pen. Code, §§ 664, 187, subd. (a));[21] counts 3 and 4, assault with a semiautomatic firearm on Officers Davila and Scanlan (§ 245, subd. (b)), and count 5, possession of a firearm by a felon (§ 29800, subd. (a)(1)).[22]

It was alleged as to counts 1 and 2, that defendant personally and intentionally discharged a firearm that proximately caused great bodily injury (§ 12022.53, subds. (c), (d)); as to count 3, he personally inflicted great bodily injury on Officer Davila (§ 12022.7, subd. (a)); as to count 4, he personally inflicted great bodily injury on Officer Scanlan that caused him to become comatose due to brain injury or suffer paralysis (§ 12022.7, subd. (b)); as to counts 1 through 4, he personally used a firearm (§ 12022.5, subd. (a)); and as to count 5, that he was armed with a firearm (§§ 667, subd. (e)(2)(C)(iii), 1170.12, subd. (c)(2)(C)(iii)).

It was further alleged that defendant had five prior strike convictions, and two prior serious felony conviction enhancements.

### Instructions

As to counts 1 and 2, the attempted murder of Officers Davila and Scanlan, the jury was instructed on the lesser included offenses of attempted voluntary manslaughter based on imperfect self-defense, and the definition of imperfect self-defense.

The jury was also instructed that defendant committed a justifiable homicide and was not guilty of counts 1 and 2, or the lesser included offenses of attempted voluntary

---

[21] All further statutory citations are to the Penal Code unless otherwise indicated.

[22] It was stipulated to the jury that defendant had a prior conviction within the meaning of section 29800, subdivision (a)(1) for purposes of count 5.

manslaughter, if he attempted to kill anyone in lawful self-defense and defined lawful self-defense.

As to counts 3 and 4, assault with a semiautomatic firearm on Officers Davila and Scanlan, the jury was instructed that defendant was not guilty of the offenses if he used force against the other person in lawful self-defense, and again defined that term.

The jury was further instructed that self-defense did not apply if the defendant, through his unlawful or wrongful conduct, created the circumstances which legally justified his adversary's use of force, unless he actually and in good faith tried to stop his unlawful or wrongful conduct, and he indicated to his adversary that he wanted to stop his unlawful or wrongful conduct, and that he did stop; and if he met those requirements, he had the right to self-defense if the other party continued to use force.[23]

---

[23] The court's instructions were consistent with the applicable law: "For killing to be in self-defense, the defendant must actually and reasonably believe in the need to defend. [Citation.] If the belief subjectively exists but is objectively unreasonable, there is 'imperfect self-defense,' i.e., 'the defendant is deemed to have acted without malice and cannot be convicted of murder,' but can be convicted of manslaughter. [Citation.] To constitute 'perfect self-defense,' i.e., to exonerate the person completely, the belief must also be objectively reasonable. [Citations.] As the Legislature has stated: '[T]he circumstances must be sufficient to excite the fears of a reasonable person ....' [Citations.] Moreover, for either perfect or imperfect self-defense, the fear must be of imminent harm. 'Fear of future harm – no matter how great the fear and no matter how great the likelihood of the harm – will not suffice. The defendant's fear must be of *imminent* danger to life or great bodily injury.' [Citation.]" (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082, fn. omitted; *People v. Hill* (2005) 131 Cal.App.4th 1089, 1101– 1102.)

"It is well established that the ordinary self-defense doctrine – applicable when a defendant *reasonably* believes that his safety is endangered – may not be invoked by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical assault or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified. [Citations.] It follows, a fortiori, that the imperfect self-defense doctrine cannot be invoked in such circumstances. For example, the imperfect self-defense doctrine would not permit a fleeing felon who shoots a pursuing police officer to escape a murder conviction even if the felon killed his pursuer with an actual belief in the need for self-defense." (*In re Christian S*. (1994) 7 Cal.4th 768, 773, fn. 1.) The California Supreme Court has repeatedly endorsed this limitation

The court also instructed the jury with CALCRIM No. 3428, mental impairment as a defense to specific intent or a mental state.

"You have heard evidence that the Defendant may have suffered from a mental disorder. You may consider this evidence only for the limited purpose of deciding whether at the time of the charged crime the Defendant acted with the intent or mental state required for that crime.

"The People have the burden of proving beyond a reasonable doubt that the Defendant acted with the required intent or mental state, specifically in Counts One and Two, and the lesser attempted voluntary manslaughter, the intent to kill. If the People have not met this burden you must find the Defendant not guilty of attempted murder or attempted voluntary manslaughter."

In addition, the court gave CALCRIM No. 3426 on voluntary intoxication.

"You may consider evidence, if any, of the Defendant's voluntary intoxication only in a limited way. You may consider that evidence only in deciding whether the Defendant acted with specific intent to kill.

"A person is voluntarily intoxicated if he or she becomes intoxicated by willingly using any intoxicating drug, drink, or other substance knowing that it could produce an intoxicating effect or willingly assuming the risk of that effect.

"In connection with the charge of attempted murder the People have the burden of proving beyond a reasonable doubt that the Defendant acted with intent to kill. If the People have not met this burden you must find the Defendant not guilty of attempted murder.

---

on the application of the imperfect self-defense doctrine. (See, e.g., *People v. Rangel* (2016) 62 Cal.4th 1192, 1226; *People v. Enraca* (2012) 53 Cal.4th 735, 761; *People v. Valencia* (2008) 43 Cal.4th 268, 288.

"Moreover, a quarrel provoked by a defendant, or a danger which he has voluntarily brought upon himself by his own misconduct, is not sufficient to support a reasonable apprehension of imminent danger. [Citation.] 'In other words, when a defendant seeks or induces the quarrel which leads to the necessity for killing his adversary, the right to stand his ground is not immediately available to him, but, instead, he must first decline to carry on the affray and must honestly endeavor to escape from it.' [Citations.]" (*People v. Hill, supra,* 131 Cal.App.4th at p. 1102.)

"You may not consider evidence of voluntary intoxication for any other purpose. Voluntary intoxication is not a defense to Counts Three, Four and Five."

## The prosecutor's closing argument

The prosecutor began by reviewing the sequence of the shooting, particularly based on Officer Scanlan's Taser video. The prosecutor stated defendant was standing by the records door when he fired five shots. Defendant fired his first shot into the window of the records door and shattered the glass. About six seconds later, Sergeant Curran was in the lobby and pointed his Taser at defendant. Defendant shot Officer Davila, but that was not shown on the video. The prosecutor stated that Officer Scanlan then pointed his Taser at defendant. Defendant stepped forward and fired his third shot, and it ricocheted off the top of the security counter. Scanlan ducked and was not shot. Scanlan's Taser video showed that defendant fired his fourth and fifth shots into Scanlan's head and arm. Lieutenant Porter arrived in the lobby, saw defendant shoot Scanlan, and Porter fired five shots at defendant.

The prosecutor argued defendant was guilty of attempting to murder both officers; he had the intent to kill because he shot Officer Davila in the face and Officer Scanlan in the head at close range; he willfully pointed the gun at them and pulled the trigger; defendant admitted that he knew he was shooting them in vulnerable locations; and he knew Scanlan was wearing a bulletproof vest.

The prosecutor further argued defendant did not act in self-defense because he was the initial aggressor, his actions were not reasonable, and he never tried to surrender until after he shot both officers and Porter returned fire.

## Defense counsel's closing argument

Defense counsel acknowledged the gravity of the officers' injuries but asked the jury to put aside that issue and focus on the evidence relevant to whether defendant acted with intent to kill or in lawful self-defense. Defense counsel noted each witness had a different view of what happened.

41.

"So what's the point of all of this. The point is that every one of these people that testified had a different story. Now, were they all lying, no, I don't believe they were lying. I don't believe you believe they were lying. But they were in a very intense situation. Things moved very rapidly…. And so the point of that is, I'm not asking you to call them liars, just as I'm not asking you to call [defendant] a liar when he testified that he believed when he was struggling with Ms. Davila that Lieutenant Porter had showed up and was pointing a gun and fired at him before he ever fired at either Ms. Davila or Mr. Scanlan. That's been his testimony. That's been his statement throughout that he fired in self-defense once he believed Lieutenant Porter arrived and started shooting at him."

Defense counsel disputed the testimony from the prosecution witnesses about when Lieutenant Porter arrived in the lobby and started shooting, and summarized defendant's explanation that he shot the two officers to defend himself:

"Now, it's a difficult thing to imagine that a person with a gun is fearful of two unarmed individuals. Remember that in his mind at the time he's thinking, If they get me, they knock me down or whatever, I lose this gun, they are going to kill me. I'm a dead man. This is what he's thinking at the time. Again, it's not rational today to think that, but at the time that was what he was thinking."

As to counts 1 and 2, defense counsel argued defendant was not guilty of either attempted murder or attempted manslaughter because he was engaged in lawful self-defense, and the jury had to decide "whether his actions were reasonable taking into consideration all of the circumstances you knew that he was engaged in at that time." As to counts 3 and 4, assault with a semiautomatic weapon, counsel similarly argued defendant acted in lawful self-defense because he reasonably believed he was in imminent danger of suffering bodily injury, the immediate use of force was necessary to defend against that danger, and he used no more force than was reasonably necessary to defend against the danger.

"The Defendant's belief that he was threatened may be reasonable even if he relied on information that was not true. However, the Defendant must have actually and reasonably have believed that that information was true. Again, you've heard what [defendant] testified to with respect to what he believed at that time. It's your job to determine whether that belief was

42.

reasonable under the objective person standard. It's the People's burden to show that he did not act in lawful self-defense."

Defense counsel cited Dr. Yufik's testimony that defendant's very intense paranoia was exacerbated by his antisocial personality disorder and argued his voluntary intoxication could be considered to determine if he acted with the specific intent to kill as to counts 1 and 2, attempted murder.

> "Yes, [defendant] took meth willingly. He had a habit for awhile. And so it's not through some other means that this substance got into his system. He did it willingly. But the law allows you to consider that voluntary intoxication to the extent that it causes a mental state that would not allow him to form the intent to commit the act, in this case the intent to kill. And so I'm asking you to look at the potential that, one, [defendant] lacked the intent to kill either Ms. Davila or Mr. Scanlan due to his high level of intoxication and the paranoia, as well I'm asking you to consider that at the time the paranoia had placed him in such a situation that he believed people were out to kill him, and that included Lieutenant Porter, Mr. Scanlan, Ms. Davila, Mr. Curran, all of these individuals he believed were there to kill him. Again, as he testified on the stand, that's not reasonable today. At the time he believed that was true."

Defense counsel argued that defendant was not the initial aggressor; he was only disruptive, and he was not violent. Counsel further declared the correctional officers did not act within the scope of their duties when they used physical and deadly force against defendant. Counsel argued that Officer Davila "became physical" when she grabbed defendant's arm to usher him out, and she "was not acting" as a correctional officer because she placed her hands on defendant before he did anything violent. Counsel also cited defendant's testimony that he raised his hands earlier in the incident than described by the officers.

Defense counsel concluded that if the jury believed defendant acted in self-defense, he was not guilty of counts 3 and 4. In the alternative, counsel argued the jury could find defendant guilty of attempted voluntary manslaughter as lesser offenses of attempted murder if they found his subjective belief in self-defense was unreasonable.

43.

**The prosecutor's rebuttal argument**

In rebuttal, the prosecutor asserted no one could assert "with a straight face" that defendant's actions were in fact reasonable, and defendant even admitted that when he testified. The prosecutor argued defendant's testimony could not be believed, and disputed defense counsel's sequence of events.

The prosecutor agreed defendant raised his hands and held up the gun, but he did not try to surrender until after he shot both officers, just before the police entered the lobby and arrested him at gunpoint. The prosecutor also agreed Lieutenant Porter was by the metal detector when he fired shots at defendant, but disputed defendant's claim that Porter was in the lobby before defendant shot the two officers, and cited Porter's testimony that he fired his gun after he saw Officer Scanlan lying on the floor and thought he was dead.

The prosecutor argued defendant's trial testimony could not be believed because he was "a three-time convicted rapist. If you are the type of person that is going to rape on three occasions, you'll have no problem lying on the witness stand. He's an admitted liar. [H]e at some point determined them white lies, but he's an admitted liar. He told the detectives that he lied about the name of his girlfriend. He told the detective according to his own statement, the Defendant's own statement, well when he told them initially, he said he showed the gun to Hanlin behind the counter, but you know, that was later proven to be incorrect. So he lied about that." Defendant lied when he claimed that he ran to the jail, but the video showed that he was walking. "Dr. Yufik testified that [defendant], due to his anti-social personality disorder, was dishonest with frequent opportunistic lying. And I submit to you that on the witness stand when you are on trial for attempted murder, that is opportunistic. The Defendant didn't even want to admit without questioning that he committed the three rapes that he was convicted of. He lied about his meth use. He's told at least three different versions around this case as to when he used meth for the first time…. His testimony didn't make sense just internally. He

44.

said he's afraid of his girlfriend's friend and he wants to get help. Yet, as he's walking around prior to entering the jail he passes a police car on 'N' Street and he passes a police car on 'M' Street. He doesn't flag any of those down. If somebody is in fear for their life, Hey, look, there's a police officer, time to flag him down. He doesn't call 911. He stated he didn't call 911 because all three of his cell phones lost signal at 'M' Street in downtown Fresno all at the same time. He said he was afraid of being killed, yet he wanted to be killed when he said just put whatever in me and finish me off."

The prosecutor argued both officers were acting within the scope of their duties when defendant shot them, and Officer Scanlan saved lives and suffered injuries that changed his life when he rushed into the lobby without a firearm after he saw defendant shoot Officer Davila. Defense counsel did not object.[24]

The prosecutor concluded that Dr. Yufik's testimony showed that defendant's methamphetamine use did not cause the shooting, because defendant's failures in occupational and social functioning existed before he used drugs. He did not shoot the officers because he was high; he shot them "because he's a sociopath."

### CONVICTIONS AND SENTENCE

On March 29, 2018, the jury convicted defendant on all counts and found all the special allegations true. On the same day, defendant admitted the prior conviction allegations.[25]

On April 27, 2018, the court imposed an aggregate sentence that consisted of a determinate term of 20 years based on the prior serious felony enhancements, plus two consecutive indeterminate terms of 25 years to life for the firearm enhancements, and two

---

[24] In issue II, *post*, we will address defendant's claim that the prosecutor improperly appealed to the jury's sympathies in this portion of closing argument.

[25] In issue III, *post*, we will address defendant's argument that the court failed to advise him of the penal consequences of his admissions to the prior conviction allegations.

consecutive indeterminate terms of life with the possibility of parole for the attempted murder convictions, with third strike minimum eligible parole dates (MEPDs) of 21 years on each count.

## DISCUSSION

### I.       Defendant's Juvenile Adjudication

Defendant raises two claims of prosecutorial misconduct.  We begin with his contention that the prosecutor allegedly committed prejudicial misconduct during cross-examination because he asked defendant about his juvenile adjudication for "a shooting," and that question violated the court's pretrial ruling that excluded his juvenile adjudication for assault with a firearm.  The People assert that the defense opened the door to the prosecutor's questions through direct examination questions on the same subject, defense counsel failed to object, and there was no prejudice.

#### A.       *Prosecutorial Misconduct*

"A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process.  Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury." (*People v. Morales* (2001) 25 Cal.4th 34, 44; *People v. Samayoa* (1997) 15 Cal.4th 795, 841.)

"When a claim of misconduct is based on the prosecutor's comments before the jury, as all of defendant's claims are, ' "the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." ' [Citations.]" (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 305.)

"To preserve a claim of prosecutorial misconduct for appeal, a defendant must make a timely and specific objection and ask the trial court to admonish the jury to

46.

disregard the improper argument. [Citation.]" (*People v. Gonzales and Soliz, supra,* 52 Cal.4th at p. 305.) "A failure to timely object and request an admonition will be excused if doing either would have been futile, or if an admonition would not have cured the harm. [Citation.]" (*People v. Linton* (2013) 56 Cal.4th 1146, 1205.)

## B.     *The Court's Pretrial Ruling on Impeachment*

Defendant's prosecutorial misconduct claim is based on the court's pretrial evidentiary ruling on the People's motion to impeach defendant's expected trial testimony. The prosecutor moved to impeach defendant with his five prior convictions as an adult: two convictions for rape by force, and one conviction for rape in concert with a gang enhancement, all of which occurred in 1998; and rape by force with a gang enhancement, and rape in concert in 2000.

The People also moved to impeach defendant with prior juvenile adjudications that occurred in 1995 for assault with a firearm, in violation of section 245, subdivision (a)(2), and vehicle theft (Veh. Code, § 10851, subd. (a)).

At the hearing on the motion, the court noted some of defendant's prior convictions were old, but he was continuously incarcerated with only short periods of time out of custody. The court held defendant could be impeached with the three prior forcible rape convictions and excluded his prior convictions for rape in concert and the gang enhancements.

The court excluded defendant's prior juvenile adjudications for impeachment:

"… I am of the mind to not allow [defendant] to be impeached with the juvenile matters occurring in 1995. Although those are crimes of moral turpitude, they are obviously remote, but most importantly to the Court [section] 245[, subdivision] (a)(2) of the Penal Code is very close to what is charged in the case before me. And I would be reluctant to allow admission to essentially the same admission of a conviction of essentially the same crime as charged in this case. So I'm going to preclude the juvenile matters."

47.

Defense counsel requested the court "sanitize" defendant's prior forcible rape convictions "so that what is introduced is a felony conviction, which is a crime of moral turpitude, and a conviction date," because it would be prejudicial for the prosecutor to impeach defendant with a prior conviction for raping a minor.[26] The prosecutor replied the prior rape convictions were already "neutral," there was nothing to indicate the victims were minors, and the prosecutor did not intend to mention the victims were minors. The court denied defendant's motion to sanitize.

## C. *Defendant's Direct Examination Testimony*

When defendant testified at trial, defense counsel began direct examination by asking about his background. In response, defendant testified he was 39 years old, and he came to the United States with his family from a refugee camp in Thailand when he was very young. The family lived in Montana, Merced, and Crescent City. They moved to Fresno when he was in the fifth grade.

Defense counsel asked defendant if he attended and graduated from high school, and whether he had any problems in school. Defendant testified he dropped out after his freshman year; he had problems with "other races" and gangs in school and got in a couple of "scuffles."

> "[DEFENSE COUNSEL:] … And since you didn't graduate from high school – well, let me ask you, how far did you get in high school?
>
> "A   I got my high school diploma *in the institution*.
>
> "Q   Okay. Before we get there, how long did you go to high school before you dropped out?
>
> "A   I finished my freshman year.

---

[26] As we will discuss below, the People attached the probation report from defendant's prior convictions that stated in April 1998, he was a "shot caller" for the Mongolian Boyz Society criminal street gang, he was part of a group of 13 gang members who repeatedly raped and assaulted three females, aged 12, 13, and 14 years old, and held the victims in a motel room for 20 hours against their will.

"Q      Okay.  And when you dropped out, what did you – what did you do with your time?

"A      Nothing really.  *Soon after that it was only a few months and then the incarceration.*

"Q      Okay.  *And how old were you then?*

"A      *15.*

"Q      And you've been incarcerated a couple of times, haven't you?

"A      Two times."  (Italics added.)

Defense counsel asked defendant about his relationship with his parents, and then returned to his background:

"Q      So after – well, *you are 15 and you get incarcerated*, when are you released?

"A      Shortly after turning 18.

"Q      Okay.  So now you are 18, and you're out in the community.  What are you doing now?

"A      Tried to get some work.  I think I was starting a job.  I think it was Peter Piper Pizza at the time.

"Q      Okay.  So you worked at Peter Piper Pizza?

"A      Shortly.  It was only a couple of weeks.

"Q      Okay.  And did you get another job after that?

"A      No.  The – now the second incarceration.

"Q      So you were – that second incarceration you were convicted of a felony, correct?

"A      Yes.

"Q      Couple of felonies?

"A      Yes.

"Q      And you did some prison time, correct?

49.

"A     Yes.

"Q     How long were you in prison?

"A     A little over 17 [years]."  (Italics added.)

### D.     *Cross-examination*

On cross-examination, the prosecutor asked defendant about the testimony he just gave regarding his background.

"Q     … You said you came to Fresno and you started in school, is that right?

"A     Yes.

"Q     And you had some problems in school?

"A     Yeah.

"Q     You had some problems with gangs you said, right?

"A     Correct.

"Q     What were your problems with gangs?

"A     What do you mean what was my problems with gangs?

"Q     Well, you said you had problems with gangs, what was your problem with the gangs?

"A     They were all in the school.  Why don't you be specific?

"Q     Okay.  Were you in a gang?

"A     Yes.

"Q     Which gang?

"A     Mongolian Boyz.

"Q     So is that one of the problems you had with the gang is that you were in a gang?

"A     No.

50.

"Q     *Okay. When you were 15-years old were you involved in a shooting?*

"THE COURT:     *See counsel, please.* (Sidebar conference, not reported.)

"Q     *Okay. So when you were 15, you got incarcerated, right?*

"A     *Correct.*

"Q     *That's what you testified to on direct?*

"A     *Yes.*

"Q     *And how long were you incarcerated for?*

"A     *Two and a half, a little over two and a half.*

"Q     Okay. So when did you get out?

"A     I think in the end of '97.

"Q     Okay. And then you said you were incarcerated a second time?

"A     Yes.

"Q     Okay. When were you incarcerated the second time?

"A     Maybe April.

"Q     Of what year?

"A     '98.

"Q     So you got out of being incarcerated the first time in '97, and then you got incarcerated again in April of '98?

"A     Something like that.

"Q     Okay. And how long were you incarcerated for?

"A     Um, 17, almost 18 years." (Italics added.)

### E.   *Forfeiture*

Defendant contends the prosecutor committed prejudicial misconduct when he asked him on cross-examination whether he was involved "in a shooting" when he was

15 years old. Defendant asserts that by asking that question, the prosecutor violated the court's pretrial evidentiary ruling that excluded his prior juvenile adjudication, and improperly informed the jury that defendant committed a shooting when he was a teenager.

We first address the People's assertion that defendant forfeited this claim because he did not object to the prosecutor's question or request an admonition. Defendant replies that defense counsel never had the opportunity to object since the court immediately called for an unreported sidebar conference after the prosecutor asked the question about the shooting. Defendant argues he did not forfeit review because the court preserved the objection by interrupting the prosecutor, and defense counsel did not have the opportunity to object on the record "[b]ecause of the court's sidebar conference."

Defendant is correct that when the prosecutor asked defendant about whether he committed a shooting, the court immediately interrupted and asked to see both attorneys at a sidebar conference that was not reported. Thereafter, the prosecutor resumed cross-examination but did not ask another question about a prior shooting. Instead, the prosecutor limited his questions to how long defendant had been incarcerated, and that was a topic defendant had already testified about on direct examination.

While there is no indication that defense counsel raised a specific objection during the sidebar conference, the court's intervention would have been sufficient to address any issue about whether the prosecutor's question was inappropriate. If defense counsel disagreed with the court's resolution of the issue, however, counsel could have made a record of the sidebar conference after the jury had been excused for a recess or requested an admonition or limiting instruction. There is nothing in the record to suggest that if defendant had requested an admonition, that request would have been futile, or an admonition would have failed to cure some alleged harm. (Cf. *People v. Hill* (1998) 17 Cal.4th 800, 820.) Counsel's failure to do so forfeited review of his prosecutorial misconduct claim.

**F.** *The Scope of a Prosecutor's Cross-examination*

Defendant raises ineffective assistance as an alternative contention if we find his attorney failed to preserve review of his misconduct claim based on the prosecutor's question. "To show ineffective assistance of counsel, defendant has the burden of proving that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and that there is a reasonable probability that, but for counsel's unprofessional errors, the result would have been different. [Citations.] A mere failure to object to evidence or argument seldom establishes counsel's incompetence. [Citations.]" (*People v. Frierson* (1991) 53 Cal.3d 730, 747.) We thus turn to the merits.

"A prosecutor is permitted wide scope in the cross-examination of a criminal defendant who elects to take the stand. [Citation.]" (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1147.) "The prosecutor is entitled to attempt to impeach the credibility of a defendant's testimony [citation] and point out inconsistencies between his or her testimony and prior inconsistent statements. When a defendant chooses to testify concerning the charged crimes, the prosecutor can probe the testimony in detail and the scope of cross-examination is very broad. [Citations.]" (*People v. Dykes* (2009) 46 Cal.4th 731, 764.)

"It is, of course, misconduct for a prosecutor to 'intentionally elicit inadmissible testimony.' [Citations.]" (*People v. Bonin* (1988) 46 Cal.3d 659, 689, overruled on another point in *People v. Hill*, *supra*, 17 Cal.4th at p. 823, fn. 1; *People v. Smithey* (1999) 20 Cal.4th 936, 960; *People v. Bell* (1989) 49 Cal.3d 502, 532.) Under certain circumstances, however, a defendant may " 'open the door' " to the introduction of evidence that had been otherwise excluded. (See, e.g., *People v. Rowland* (1992) 4 Cal.4th 238, 259; *People v. Steele* (2002) 27 Cal.4th 1230, 1246–1249; *People v. Wharton* (1991) 53 Cal.3d 522, 591–592.)

In *People v. Gutierrez, supra*, 28 Cal.4th 1083, the defendant testified on direct examination that he used drugs with the victim and attempted to buy drugs shortly before her death. On cross-examination, the prosecutor asked the defendant questions that were designed to elicit the fact that he was found in unlawful possession of drugs and prescription medications, and the trial court overruled numerous defense objections. *Gutierrez* held the court properly overruled the objections because the defendant's direct examination testimony "opened the door to further inquiry concerning his admitted drug use," and it was relevant and probative to the disputed issues. (*Id.* at p. 1147.)

In *People v. Dykes, supra*, 46 Cal.4th 731, the defendant testified on direct examination that he owned a firearm "purely for self-protection because 'at the time there [were] a lot of dope dealers on the street, they [were] having altercations ... up the street ... [and] I just felt I didn't want to be caught in it and be made a statistic.' On cross-examination, the prosecutor also elicited testimony that [the] defendant purchased the firearm because there were drug dealers in the neighborhood," (*id.* at p. 765) and asked a series of questions about whether he was a drug dealer, his prior statement that he had stopped selling drugs, and "elicited the admission that 'this isn't the first gun that [the] defendant] ever owned,' and that [the] defendant had been on probation for illegal possession of a firearm when the murder occurred." (*Ibid.*)

*Dykes* rejected the defendant's argument that the prosecutor committed prejudicial misconduct with the line of cross-examination questions. It held defense counsel's direct examination questions about why the defendant purchased a firearm had "open[ed] the door to examination on the same point by the prosecution. The prosecutor was entitled to explore the credibility of [the] defendant's claim that he had purchased a firearm solely for self-protection." (*Dykes, supra*, 46 Cal.4th at p. 766.)

### G.     *Analysis*

As explained above, the court granted defendant's pretrial motion and held he could not be impeached with his prior juvenile adjudication for assault with a firearm, committed when he was 15 years old, because it was too similar to the charged offenses.

When defendant testified on direct examination, defense counsel asked him numerous questions about his childhood, background, and problems in school. In response to these questions, defendant testified that he dropped out of high school, he got his diploma "in the institution" a few months after dropping out, he was subject to "incarceration" when he was 15 years old, and he was released when he was 18 years old.

Defendant thus testified on direct examination that he was sent to some type of "institution" when he was 15 years old and incarcerated for approximately three years, leading to the implication that he committed some type of an offense when he was a juvenile.

Defendant argues the prosecutor intentionally violated and disobeyed the court's pretrial evidentiary ruling because he asked about the juvenile adjudication on cross-examination. Under the above circumstances, however, the prosecutor's question on cross-examination appears based on his reasonable belief that defendant's direct examination testimony opened the door to cross-examination about the *reason* for his "incarceration" in an "institution" when he was 15 years old, and why he was held there until he was 18 years old.

Defendant argues that when the prosecutor resumed cross-examination after the sidebar conference, the prosecutor continued to deliberately and willfully violate the court's pretrial evidentiary ruling that excluded the juvenile shooting offense, because the prosecutor again asked defendant if he was incarcerated when he was 15 years old. The entirety of the record refutes defendant's assertions. The sequence began when the prosecutor asked defendant about whether he committed a shooting. The court immediately stopped cross-examination and conducted the unreported sidebar. When the

prosecutor resumed cross-examination, he did not ask defendant any more questions about whether he committed a shooting, or what he did that resulted in his incarceration in an institution when he was 15 years old. Instead, the prosecutor asked defendant how long he was incarcerated when he was a teenager and at other times in his life. These questions were consistent with defendant's direct examination testimony, defense counsel did not object, and the court did not interrupt the prosecutor's continued cross-examination.

While the sidebar conference was not reported or otherwise placed on the record, the record implies the court found defendant's direct examination testimony might be construed to open the door to evidence that he was incarcerated in an institution when he was a teenager, but not to questions about the particular offense defendant committed that resulted in that incarceration. The prosecutor resumed cross-examination with questions about his incarceration and the court did not interrupt him again, implying that the questions did not violate the court's ruling at the unreported sidebar.

Defendant claims an objection and request for an admonition "would not have cured the harm caused by the prosecutor" because the jury had already learned through the prosecutor's question that defendant was involved in a shooting incident when he was 15 years old, even though defendant never answered the question. Defendant asserts the prosecutor's point was reinforced with his next question after the sidebar, because he asked defendant about being incarcerated when he was 15 years old. Defendant further argues the prosecutor's misconduct "had the effect of casting doubt on [his] defense of self[-]defense and imperfect self[-]defense and of attacking [the] credibility" of his claim that he shot the officers "out of fear for his own safety."

As we have already noted, there is nothing in the record to suggest that if defendant had requested an admonition, that request would have been futile, or an admonition would have failed to cure any alleged harm. While the sidebar was unreported, defendant could have placed the conference on the record when the jury was

56.

excused at the next recess. As for the alleged implications of the prosecutor's question about the shooting, it is equally reasonable that the jury could have reached the opposite conclusion – that the court interrupted the prosecutor, and the prosecutor did not repeat the question about the shooting because defendant did not commit that alleged offense. In addition, the court instructed the jury that the questions from the attorneys were not evidence, not to assume something is true "just because one of the attorneys asked a question that suggested it was true," and if a witness "was not permitted to answer" a question, the jury could not "guess what that answer might have been or why I ruled as I did." We presume the jury followed the court's instructions. (*People v. Stitely* (2005) 35 Cal.4th 514, 559*; People v. Seumanu* (2015) 61 Cal.4th 1293, 1345.)

When the trial court sustains objections "to the argumentative element of the prosecutor's questioning, we assume any prejudice was abated. [Citations.]" (*People v. Dykes, supra*, 46 Cal.4th at p. 764; *People v. Trinh* (2014) 59 Cal.4th 216, 249.) The court effectively took such action in this case when it immediately intervened and limited the scope of the prosecutor's cross-examination, and there was no prejudice from the prosecutor's brief and limited single question. Accordingly, "the consequences of the improper question[] fell far short of 'infect[ing] the trial with such unfairness as to render the subsequent conviction a denial of due process' [citation], and there is no reasonable probability they influenced the verdict [citation]...." (*People v. Trinh, supra,* 59 Cal.4th at p. 249.)

To the extent there was any prejudice, the prosecutor's unanswered question was not inflammatory compared to the nature of the charged offenses – that defendant intentionally shot Officer Davila in the jaw and Officer Scanlan in the head, even though he acknowledged they were unarmed and that Scanlan was wearing a bulletproof vest. (See, e.g. *People v. Ewoldt* (1994) 7 Cal.4th 380, 405.) In addition, defendant admitted that he was "incarcerated" for whatever offense he committed when he was 15 years old, and also incarcerated for his multiple rape convictions, so there was no risk the jury

would be inclined to convict him of the current charges to punish him for a speculative, prior offense. (*People v. Tran* (2011) 51 Cal.4th 1040, 1050.)

The prosecutor did not commit prejudicial misconduct, and defense counsel was not prejudicially ineffective for failing to object.

## II. Prosecutorial Misconduct – Closing Argument

Defendant's second claim of prosecutorial misconduct is that he allegedly aroused the passions and prejudices of the jury in rebuttal argument by improperly appealing for the jurors to have sympathy for Officer Scanlan's family, and that improper argument prevented the jury from reaching a verdict based on an objective determination of the evidence. Defendant argues the prosecutor "diverted the jury from its objective consideration of [his] testimony about his fear and the defense expert's testimony about appellant's methamphetamine-induced psychosis and instead invited the jury to make a purely subjective response to decide the verdicts based on their emotions."

Defense counsel did not object to the prosecutor's argument, and defendant again argues counsel was prejudicially ineffective for failing to do so. We thus address the merits.

### A. *Defense Counsel's Argument*

In counts 1 and 2, defendant was charged with the attempted murders of custodial officers, that he unlawfully attempted to kill Officers Davila and Scanlan, who were "custodial officer[s] engaged in the performance of duty and this was known or reasonably should have been known by defendant."

One of defense counsel's claims in closing argument was defendant was not the initial aggressor, he was only disruptive, and he was not violent when he was standing in the lobby. Counsel declared the correctional officers did not act within the scope of their duties when they used physical and deadly force against defendant, and thus the jury could not find that they were acting within the scope of their duties as required by the special allegations for counts 1 and 2.

58.

Defense counsel asserted:

"So [defendant] went in there not to engage in anything with anyone. He wanted to be arrested. And Ms. Davila approached him, and the People have asked you to consider the enhancement concerning the fact that Ms. Davila and Mr. Scanlan were correctional officers. And that is one of the enhancements that you could consider with respect to Counts One and Two, I believe. And that would require that Mr. Scanlan and Ms. Davila were performing the duties of a correctional officer at the time that they engaged with [defendant]. What is the – what are the duties of a correctional officer?They work at the jail.They interact with inmates. Certainly the security of the jail would be one of them. *But I would argue to you when someone comes into the jail that is not being physical, is not being violent, and is simply arguably being disruptive, the COs at that point are not – if they engage with that person and become physical they are not using their CO powers, they are going beyond those powers.* And so when Ms. Davila walked up to [defendant] and grabbed him by the arm and tried to usher him out, she was not acting as a CO. And so the People – and this has two implications for us. First of all, with respect to the enhancements that the People want you to find in One and Two, *I don't think you can find that they were acting as COs when they engaged in this altercation with [defendant]*. And secondly … whether or not this was self-defense.Ms. Davila placed her hands on [defendant] before he had done anything that was menacing, violent, or anything like that." (Italics added.)

Defense counsel continued:

"The question is, did [defendant] attempt to murder two correctional officers who were engaged in the performance of their duties? I've explained to you why I don't think you can find that that was what occurred. *Those officers were not engaged in their duties.There [sic] duties include handling the inmates, helping individuals who want to visit people perform their visits.* [¶] *But it is not grabbing onto an individual and ushering them out of a jail. That's the job for a police officer.* Okay. Like any other business somebody comes in and is unruly, you call the cops, and they come in and they remove him. Remember the instruction on whether a correctional officer is engaged in their duties indicates that they are not police officers. And they cannot go beyond their power as a correctional officer. So that's the question for you. Were they engaged in their duties, and did [defendant] intend to kill these two individuals, or did he act in self-defense?"

**B.** *The Prosecutor's Rebuttal*

The prosecutor used rebuttal to respond to nearly all of defense counsel's assertions, including the claim that defendant did not initiate what happened in the lobby and the officers inappropriately used force against him:

> "[Defendant's] actions justify the office[rs'] responses. He created this situation, thus he's not allowed to claim imperfect self-defense, nor is he allowed to claim perfect self-defense either unless you find he surrendered, which he did not. [¶] What was [defendant's] conduct about [bringing] the loaded illegal semi-automatic gun to the jail? Disruptive, refused to leave, shot out the window, he was a threat to the correctional officers, he was a threat to the public. All of these things happened prior to any correctional officer using non-lethal force. And you heard the first force that was used were Tasers and PepperBall guns. The Defendant's got a gun. He's discharging it in the lobby. And all the correctional officers had were Tasers and PepperBall guns to respond with."

The prosecutor next addressed defense counsel's claim that Officers Davila and Scanlan were not acting within the scope of their duties when they encountered defendant in the lobby, as alleged for counts 1 and 2:

> "Lieutenant Porter testified he supervises the jail. He supervises correctional officers. He said a correctional officer is within their job duties to remove a disruptive person from the lobby. And a custodial officer may use reasonable force, and it is his or her duty to restrain a person, to overcome resistance, to prevent escape, or in self-defense or in defense of any other person. And if a person knows or reasonably should know that a custodial officer is restraining him or her, that person does not use force or any weapon to resist an officer's use of reasonable force. And that is what Juanita Davila was doing. She was overcoming [defendant's] resistance to leaving the jail by using reasonable force. And this instruction says it right here, you can't resist reasonable force and bring out a weapon.
>
> *"It's clear from the evidence, obviously we can't hear from [Toamalama] Scanlan, but it's clear what he was doing. It's clear that he saw Juanita Davila get shot, and he was coming to her aid. He gave up any prospect of having a meaningful life after watching his co-worker get shot in order to try to rescue his co-worker. And it's clear that he saved lives. There were bullets directed at him....*

60.

*"Tepa Scanlan and their six kids lost a husband and a father because Toamalama Scanlan tried to defend Juanita Davila that day from an active shooter in the lobby with a Taser against a gun."* (Italics added.)

### C.    *Closing Argument*

Defendant relies on the italicized portion above of the prosecutor's rebuttal argument, and argues he committed prejudicial misconduct by appealing to the jury's passions and sympathies for Officer Scanlan and his family.

"It is settled that a prosecutor is given wide latitude during argument.  The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom. [Citations.]" (*People v. Wharton*, *supra*, 53 Cal.3d at p. 567; *People v. Samoyoa*, *supra*, 15 Cal.4th at p. 841.)  The prosecutor may give his or her opinion on the state of the evidence, attack the defense case, and focus on the deficiencies in defense counsel's tactics and factual account.  (*People v. Redd* (2010) 48 Cal.4th 691, 734–736.)

However, it is not appropriate for the prosecutor "to appeal to the passions and prejudices of the jury." (*People v. Seumanu, supra,* 61 Cal.4th at p. 1342.)  "Although a prosecutor may vigorously argue the case, appeals to sympathy for the victim during an objective determination of guilt fall outside the bounds of vigorous argument. [Citations.]" (*People v. Amezcua and Flores* (2019) 6 Cal.5th 886, 920.)  A prosecutor who invites jurors to view the crime through the victim's eyes makes "an improper appeal to emotion and sympathy." (*Ibid*.; see *People v. Pensinger* (1991) 52 Cal.3d 1210, 1250 [argument urging the jury to imagine the crime had happened to their own child held an improper appeal to the passion and prejudice of the jury].)

### D.    *Analysis*

Defendant argues the prosecutor's rebuttal statements about Officer Scanlan's grievous injuries and how his life was changed by being shot in the head, were irrelevant and inflammatory and constituted a "blatant improper appeal to the jury's passions and prejudices."  Defendant claims the prosecutor's argument "had nothing to do with the

jury's duty to conduct an objective determination of guilt" and "diverted the jury's attention from its proper role."

Defense counsel did not object to the prosecutor's rebuttal argument, there is nothing in the record to show that it would have been futile for counsel to object or request an admonition, and defendant has forfeited this claim.

As to defendant's alternative argument of ineffective assistance, the entirety of record shows the prosecutor's rebuttal argument was not an attempt to inflame the jury's passions and prejudices. Contrary to defendant's assertions, the prosecutor was directly responding to defense counsel's closing argument that Officers Davila and Scanlan were not acting within the scope of their duties as correctional officers when they confronted defendant in the lobby, that both officers acted beyond their lawful powers, that they should have called the police to deal with defendant, and that police officers would have acted within the scope of their lawful duties to grab someone and make them leave the lobby. Defense counsel asserted: "Like any other business somebody comes in and is unruly, you call the cops, and they come in and they remove him." Defense counsel argued the jury could not find the allegations as to counts 1 and 2 true, but it could consider whether defendant acted in self-defense since the correctional officers acted beyond the scope of their lawful duties.

Given the context of defense counsel's closing argument, the prosecutor used rebuttal argument to assert that once Officer Scanlan saw defendant shoot Officer Davila, he rushed into the lobby to try and rescue her and others who were there, even though Scanlan only had a Taser and did not have a firearm.

As noted above, when a prosecutorial misconduct claim "focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion. [Citation.]" (*People v. Samayoa, supra*, 15 Cal.4th at p. 841.)

We consider the remarks in the context of the whole argument and the instructions. (*People v. Centeno* (2014) 60 Cal.4th 659, 667.)

Even if the prosecutor's argument was improper and defense counsel had preserved the issue, the prosecutor's brief remarks "in a much longer closing argument, and an even longer trial, could not have prejudiced defendant, especially given the strong evidence of his guilt. [Citations.]" (*People v. Seumanu, supra*, 61 Cal.4th at p. 1344.) The prosecutor's rebuttal argument was based on admissible evidence that Officer Davila had already been shot when Sergeant Curran and the others entered the lobby, that Officer Scanlan only had a Taser and pepper spray and was not armed with a firearm, that defendant shot him in the head, and he suffered an irreversible traumatic brain injury. Mrs. Scanlan testified about their family life, their children, and what her husband's life had been before and after being shot in the head.

Moreover, the court instructed the jury that it had to decide the case "based only on the evidence that has been presented to you in this trial. Do not let bias, sympathy, prejudice, or public opinion influence your decision." The court further instructed that the attorneys' closing arguments were not evidence. We assume the jury followed these instructions. (*People v. Stitely, supra,* 35 Cal.4th at p. 559*; People v. Seumanu, supra*, 61 Cal.4th at p. 1345.) The prosecutor's brief rebuttal argument, based entirely on the evidence, did not render the trial fundamentally unfair or otherwise infect the trial with such unfairness as to violate the defendant's constitutional rights. (*People v. Seumanu,* at p. 1345.)

We thus conclude that to the extent defense counsel should have objected and/or requested an admonition, the failure to do so did not amount to prejudicially ineffective assistance.

## III.    Defendant's Admissions to the Prior Conviction Allegations

Defendant next argues the court failed to advise him of the penal consequences of his admissions to the prior conviction allegations, and his admissions must be reversed

and the matter remanded.  The People concede the court failed to give the advisements but argue defendant forfeited review of this issue by failing to object.[27]

## A.    *The Court's Duty to Advise of the Penal Consequences*

When a criminal defendant admits a prior conviction allegation that subjects him to increased punishment, the trial court is required to ensure that the plea is knowing and voluntary.  (*People v. Cross* (2015) 61 Cal.4th 164, 170 (*Cross*).)  "[T]he court must inform the defendant of three constitutional rights – the privilege against compulsory self-incrimination, the right to trial by jury, and the right to confront one's accusers – and solicit a personal waiver" of each right pursuant to *Boykin v. Alabama* (1969) 395 U.S. 238, 243–244 and *In re Tahl* (1969) 1 Cal.3d 122, 130–133.  (*Cross*, at p. 170.)

In addition, a defendant "who admits a prior criminal conviction must first be advised of the increased sentence that might be imposed.  [Citations.]" (*People v. Wrice* (1995) 38 Cal.App.4th 767, 770.)  "If the advice and waivers do not appear on the record the finding must be set aside on appeal *if prejudice appears*.  [Citation.]" (*People v. Karis* (1988) 46 Cal.3d 612, 650, italics added.)

"However, unlike the admonition required for a waiver of constitutional rights, advisement of the penal consequences of admitting a prior conviction *is not constitutionally mandated*.  Rather, it is a judicially declared rule of criminal procedure. [Citations.]" (*People v. Wrice, supra,* 38 Cal.App.4th at p. 770, italics added; *Cross*, *supra*, 61 Cal.4th at pp. 170–171, 179; *People v. Howard* (1992) 1 Cal.4th 1132, 1175.)

"Consequently, when the only error is a failure to advise of the penal consequences, *the error is waived if not raised at or before sentencing*.  [Citation.]  Such policies ensure the fair and orderly administration of justice.  [Citation.]  'The purpose of

---

[27] Defendant's appellate contention only addresses his admissions to the prior convictions alleged as strikes and prior serious felony enhancements.  He stipulated to the prior conviction alleged as to count 5, felon in possession of a firearm, and has not challenged the validity of that stipulation.

the general doctrine of waiver is to encourage a defendant to bring errors to the attention of the trial court, so that they may be corrected or avoided and a fair trial had.' [Citation.]  The waiver doctrine has been applied to a variety of issues concerning the imposition of sentence and the conduct of the sentencing hearing.  [Citations.]" (*People v. Wrice, supra*, 38 Cal.App.4th at pp. 770–771, italics added.)

With this background in mind, we turn to the prior conviction allegations in this case, and defendant's admissions.

## B.     *The Prior Conviction Allegations*

The second amended information contained several prior conviction allegations. As to count 5, possession of a firearm by a felon, it was alleged that defendant had a prior conviction for violating section 261, subdivision (a)(2), rape by force, violence, or duress, in 1998.

It further alleged that he had five prior strike convictions:  two counts of rape by force, violence, or duress (§ 261, subd. (a)(2)), and one count of rape in concert (§ 264.1) with a gang enhancement, in 1998; and one count of rape in concert (*ibid.*), and one count of rape by force, violence, or duress (§ 261, subd. (a)(2)) with a gang enhancement in 2000.

It was also alleged that he had two prior serious felony conviction enhancements pursuant to section 667, subdivision (a), based on his convictions for rape by force, violence, or duress in 1998 and 2000.

## C.     *Defendant's Admission and Stipulation for Count 5*

Before the People rested, the court asked the parties about the prior conviction alleged as an element of count 5, felon in possession of a firearm, and whether defendant would stipulate to it.  The prosecutor said that he had prepared a stipulation, but defendant had to be advised of his constitutional rights.  Defense counsel said defendant would stipulate to the prior conviction for count 5.

The court advised defendant of his constitutional rights and that the prosecution would have the burden to prove beyond a reasonable doubt the prior conviction for forcible rape in 1998, that was alleged as an element of count 5. Defendant said he understood and waived his constitutional rights and agreed to stipulate to the prior conviction for count 5. Defendant and his attorney agreed to the prosecutor's proposed stipulation.

The parties later stipulated to that as to count 5, felon in possession, defendant had a prior conviction within the meaning of section 29800, subdivision (a)(1).

### D. *Defendant's Trial Testimony*

At trial, defendant testified and admitted he had three convictions for forcible rape in 1998 and 2000, and he was incarcerated for those offenses.

### E. *Defendant's Admissions to the Prior Conviction Allegations*

In the midst of the defense case, outside the jury's presence, the court asked defendant and his attorney if he was going to waive a jury trial on the prior conviction allegations, including the "strikes," if he was convicted of any of the charged offenses. After conferring, defense counsel said defendant would have a court trial on the allegations.

The court advised defendant of his constitutional rights to call witnesses, confront and cross-examination witnesses, his privilege against self-incrimination, and have a jury decide whether he committed the prior convictions. The court also advised defendant that if he waived a jury trial, he still had the constitutional right to a court trial and the prosecution had the burden to prove the prior convictions beyond a reasonable doubt. Defendant said he understood. The court asked defense counsel if he was satisfied, and counsel said he was.

After the jury returned the verdicts, defense counsel advised the court that defendant would admit the prior conviction allegations. The court stated:

66.

"There are multiple priors alleged, *particularly strike priors*. You have a right to a trial on the priors. We previously discussed this. You could have a jury decide whether those priors have been proven beyond a reasonable doubt. You opted to have the Court make that decision. It is also your prerogative if you wish to admit the priors. If you do so, we would not have a trial, you would simply be admitting those. Is that what you want to do?"

Defendant said yes. (Italics added.)

The court fully advised defendant of his constitutional rights. Defendant briefly conferred with his attorney, and then said he understood and waived his rights. The court read the prior conviction allegations and defendant admitted them.

The parties agree that the court failed to advise defendant of the penal consequences of his admissions to the prior conviction allegations.

## F. *The Probation Report and the Parties' Sentencing Briefs*

After defendant was convicted, the probation/presentence report was filed and recommended third strike indeterminate terms, plus consecutive terms for the prior serious felony conviction enhancements.

The People filed a sentencing brief and argued the court should not dismiss any of the five prior strike convictions because defendant was a habitual criminal, he had a lengthy criminal history of violence, the facts of his prior sexual assaults were horrific, he had been incarcerated most of his adult life, and he committed the current offenses nine months after being released from prison.

The People further argued that as to counts 1 and 2, attempted murder, the sentence was life with the possibility of parole after seven years. Based on his prior strike convictions, however, the MEPD should be tripled to 21 years for each count.

Defendant filed a request for the court to dismiss the prior strike convictions and argued he was "so intoxicated, it is probable delusions controlled his actions," and there was a substantial reason to grant relief under *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497 (*Romero*) based on "the intoxicated state" from methamphetamine abuse

67.

"and the complete lack of reason or reality on the part of the defendant," and striking one of the prior convictions would provide him with "the possibility of re-entering society in [a] positive manner."

## G. *The Sentencing Hearing*

On April 27, 2018, the court held the sentencing hearing and invited argument on the question of whether to dismiss the prior strike convictions. Both parties declined further argument and submitted the matter on their motions. The court made lengthy findings that we will discuss in issue IV, *post*, and imposed the following third strike sentence.

As to count 1, attempted murder of Officer Davila, the court sentenced defendant to life with the possibility of parole, plus 25 years to life pursuant to the section 12022.53, subdivision (d) firearm enhancement; plus two consecutive five-year terms for the two prior serious felony enhancements (§ 667, subd. (a)(1)). The court also imposed 20 years pursuant to the section 12022.53, subdivision (c) firearm enhancement, and stayed that term pursuant to section 12022.53, subdivision (f); and stayed the 10-year term for the section 12022.5, subdivision (a) firearm enhancement.

As to count 2, attempted murder of Officer Scanlan, the court again imposed life with the possibility of parole, plus 25 years to life for the section 12022.53, subdivision (d) firearm enhancement, and two consecutive five-year terms for the two prior serious felony enhancements. The court also imposed 20 years pursuant to the section 12022.53, subdivision (c) firearm enhancement, and stayed that term pursuant to section 12022.53, subdivision (f).

As to each of counts 3 and 4, the court imposed third strike terms of 25 years to life but stayed the terms and enhancements pursuant to section 654. The court imposed a concurrent third strike term of 25 years to life for count 5.

As to counts 1 and 2, attempted murder, the court stated defendant's MEPD was seven years for each count under the "Three Strikes" law. (*People v. Jefferson* (1999) 21

68.

Cal.4th 86, 94–96; *People v. Wong* (2018) 27 Cal.App.5th 972, 977, fn. 4; *People v. Robinson* (2014) 232 Cal.App.4th 69, 72, fn. 3.) The court explained the Three Strikes law applied to the calculation of the MEPDs for counts 1 and 2:

> "I concur with the analysis the People have made in regards to the indeterminate life sentences. Pursuant to the serious priors and the strike priors, the Defendant would not be eligible for parole in this Court's view in each count until 21 years has been served and then served consecutive to the other term."

While the court imposed multiple third strike sentences and prior conviction enhancements, defendant did not object or claim lack of notice.

**H.**     *Analysis*

We agree with the People that defendant forfeited any objection to the court's failure to advise him of the penal consequences of his admissions to the prior conviction allegations. The court's duty to so advise is not constitutionally mandated, and defendant failed to raise such an objection at the sentencing hearing. (*Cross, supra,* 61 Cal.4th at pp. 170–171.) The probation report recommended third strike sentences and consecutive terms for the prior serious felony conviction enhancements. The prosecution's sentencing brief argued the court should not dismiss any of the prior strike convictions, and that the Three Strikes law applied to the calculation of the MEPDs for counts 1 and 2, attempted murder. Defendant's own sentencing brief requested the court dismiss one of the prior strike convictions to reduce his overall sentence.

At the sentencing hearing, defendant did not raise objections or claim a lack of notice for the proposed third strike terms and enhancements. When the court denied his request to dismiss the prior strike convictions and imposed sentence, defendant did not raise a notice objection. (See, e.g., *People v. Melton* (1990) 218 Cal.App.3d 1406, 1409; *People v. Gibson* (1994) 27 Cal.App.4th 1466, 1469; *People v. Scott* (1994) 9 Cal.4th 331, 350, 356.) "Had the imposition of sentence on the enhancement allegations 'come as a genuine surprise, it would have been a simple matter to bring the issue to the

69.

attention of the trial court.' [Citations.] 'Upon a timely objection, the *sentencing court* must determine whether the error prejudiced the defendant, i.e., whether it is "reasonably probable" the defendant would not have pleaded guilty if properly advised.' [Citations.]" (*People v. Wrice*, *supra*, 38 Cal.App.4th at p. 771.)[28]

Defendant asserts he did not forfeit review and he was not required to object based on *Cross, supra,* 61 Cal.4th at p. 173. *Cross* does not support defendant's arguments. *Cross* held the defendant in that case did not forfeit review of an issue of first impression as to whether a defense attorney could stipulate to a prior conviction that was an element of a charged offense. (*Id*. at pp. 172–173.) *Cross* held defense counsel could not enter into such a stipulation unless the court advised the defendant of his constitutional rights and elicited a waiver of those rights. (*Id*. at pp. 168, 174–175; see *People v. Trujillo* (2015) 60 Cal.4th 850, 859 [forfeiture doctrine has no application to advisements of federal constitutional rights given a defendant before guilty plea is taken].) *Cross* did not hold that the court's failure to advise the defendant about *the penal consequences* of his prior conviction was an error of constitutional dimension or required reversal. (*Cross,* at p. 180.)

In contrast to *Cross*, defendant stipulated to his forcible rape conviction as an element of count 5, felon in possession, after being fully advised of and waiving his

---

[28] To the extent that defendant's arguments apply to the court's determination that he was required to serve a minimum of 21 years on counts 1 and 2, attempted murder, before being eligible for parole pursuant to the Three Strikes law, a case dealing with a similar issue explained that "the United States Supreme Court has stated that a defendant's parole eligibility date is not a direct consequence of which a defendant must be apprised before pleading guilty. (*Hill v. Lockhart* (1985) 474 U.S. 52, 55–56.) "The credit limitation contained within the Three Strikes law serves a role functionally equivalent to a parole eligibility date, and we conclude that neither the federal or the state Constitution, nor California's judicially declared rules of criminal procedure, required the trial court to advise defendant, prior to his guilty plea, that he would be ineligible for release from prison until he had served four-fifths of his sentence." (*People v. Barella* (1999) 20 Cal.4th 261, 263.)

constitutional rights, and that he was admitting an element of the offense and relieving the People of the burden of proving that element of the charged offense beyond a reasonable doubt. Defendant was also fully advised of and waived his constitutional rights prior to admitting the prior conviction allegations. The court failed to advise him of the penal consequences for those prior conviction allegations, but he had multiple opportunities and never objected to the court's subsequent imposition of the third strike terms and enhancements, as required by well-settled law.

Defendant acknowledges that the court's failure to advise of penal consequences is not reversible error per se but argues the absence of the advisements was prejudicial and his admissions were not knowing and voluntary since he was unaware of the sentencing impact. Defendant testified at trial and admitted his multiple prior rape convictions that were also alleged as strikes and prior serious felony enhancements, and he stipulated to the rape conviction that was alleged as an element of count 5, felon in possession of a firearm. There is nothing in the record to suggest that if the court had admonished defendant accordingly, he would have chosen to proceed to either a jury or bench trial on the prior conviction allegations that he had already admitted before the jury.

## IV. The Court's Imposition of the Firearm and Prior Serious Felony Enhancements

Defendant next contends the matter must be remanded because at the sentencing hearing, the court did not realize it had discretion to dismiss the firearm enhancements that the jury found true pursuant to section 12022.5 and section 12022.53, and the court incorrectly believed it was mandated to impose terms for those enhancements. Defendant argues his attorney was prejudicially ineffective for failing to move to dismiss the firearm enhancements even though he filed a motion to dismiss the prior strike convictions.

Defendant separately argues that remand is also required because of the subsequent enactment of Senate Bill 1393 (2017–2018 Reg. Sess.) that gave the court the

discretion to decide whether to dismiss the section 667, subdivision (a) prior serious felony conviction enhancements.

We find the entirety of the record shows remand would be an idle act as to both the firearm and prior serious felony conviction enhancements.

### A.    *The Firearm and Prior Serious Felony Enhancements*

The second amended information alleged as to counts 1 and 2, attempted murder of Officers Davila and Scanlan, that defendant personally and intentionally discharged a firearm that proximately caused great bodily injury (§ 12022.53, subds. (c), (d)); as to count 3, assault with a firearm, he personally inflicted great bodily injury on Davila (§ 12022.7, subd. (a)); as to count 4, assault with a firearm, he personally inflicted great bodily injury on Scanlan that caused him to become comatose due to brain injury or suffer paralysis (§ 12022.7, subd. (b)); and as to counts 1 through 4, he personally used a firearm (§ 12022.5, subd. (a)).

As explained above, it was also alleged that he had five prior strike convictions, and two prior serious felony conviction enhancements within the meaning of section 667, subdivision (a)(1).

On March 29, 2018, the jury convicted defendant on all counts and found all the special allegations true. On the same day, defendant admitted the prior conviction allegations.

### B.    *The Scope of the Court's Discretion at the Sentencing Hearing*

Effective January 1, 2018, Senate Bill 620 amended sections 12022.5 and 12022.53. (Stats. 2017, ch. 682, §§ 1, 2.) Pursuant to those amendments, trial courts may, "in the interest of justice pursuant to Section 1385 and at the time of sentencing, strike or dismiss an enhancement otherwise required to be imposed ...." (§§ 12022.5, subd. (c), 12022.53, subd. (h); *People v. McDaniels* (2018) 22 Cal.App.5th 420, 424.)

On April 27, 2018, the court held the sentencing hearing. We will address the parties' motions and the court's findings in further detail below.

72.

Effective January 1, 2019, after defendant's sentencing hearing, Senate Bill No. 1393 amended sections 667, former subdivision (a)(1), and 1385, former subdivision (b), and granted trial courts the discretion to strike the previously mandatory five-year prior serious felony conviction enhancement under section 667, subdivision (a)(1).  (Stats. 2018, ch. 1013, §§ 1, 2 (Senate Bill 1393).)

Thus, at the time of defendant's sentencing hearing, the court had the discretion to decide whether to dismiss the prior strike convictions pursuant to section 1385 and *Romero*, and the firearm enhancements pursuant to section 1385.

The court did not have any discretion whether to impose the section 667, subdivision (a) prior serious felony enhancements, and the five-year terms were mandatory.  It is now settled, however, that the amendments enacted by Senate Bill 1393 apply retroactively to judgments not yet final on appeal.  (*People v. Zamora* (2019) 35 Cal.App.5th 200, 207–208; *People v. Garcia* (2018) 28 Cal.App.5th 961, 972–973.)

## C.   *Sentencing Motions*

As noted above, the People filed a sentencing brief and argued the court should not dismiss any of defendant's five prior strike convictions because he was a habitual criminal and addressed his lengthy criminal history of violence.  In support of this argument, the People attached the probation report from defendant's prior sexual assault convictions, that stated defendant was a "shot caller" for the Mongolian Boys Society criminal street gang.  In April 1998, defendant was part of a group of 13 gang members who repeatedly raped and sexually assaulted three female victims, who were 12, 13, and 14 years old, and they were assaulted and held in a motel room for 20 hours against their will.  In September 1998, he was sentenced to 19 years in prison after pleading guilty to two counts of rape by force or fear, and rape in concert with a gang enhancement.  In 2000, defendant pleaded guilty to rape by force or fear with a gang enhancement, and rape in concert, based on a similar incident that occurred in March 1998, for a concurrent term of seven years.

Defendant filed a request for the court to dismiss the prior strike convictions based on section 1385 and *Romero*, based on his intoxication from abusing methamphetamine and his "complete lack of reason or reality." Defendant further argued that striking at least one of the prior strike convictions would provide him with "the possibility of re-entering society in [a] positive manner." "The potential for [defendant] to assume responsibility and take[] the necessary steps to become stable will take time but when it does the potential to re-integrate is important to the concept of interest of justice for defendant. Removing one or more of the past strike offenses would be very helpful to [defendant] and to everyone involved in this case."

## D.     *The Sentencing Hearing*

On April 27, 2018, the court held the sentencing hearing and invited argument on the question of whether to dismiss the prior strike convictions. Both parties declined further argument and submitted the matter on their motions.

The court acknowledged it had discretion to dismiss the prior strike convictions but denied defendant's request.

> "The facts and circumstances of [defendant's] prior cases have been carefully examined, multiple crimes of rape, multiple victims, all crimes with significant links to gang activity and participation. The facts of the current case are clear as well. The Court – this Court can't discern no compelling reason by striking a prior strike would be in furtherance of justice.
>
> "As the People point out, the Defendant is a habitual criminal. His lengthy criminal history includes many crimes of violence. The current offenses occurred just months after his release from prison and while on parole. For these reasons the Court respectfully declines to exercise his discretion and to strike the Defendant's prior strike conviction."

The court made the following findings before it imposed sentence:

> "First, Mr. Vang, although you feel your actions were justified, the facts, the law, and the jury say otherwise. Your actions on that fateful morning are both disturbing and tragic. They are not surprising, however, for you are a self-admitted gang member with a particularly violent

74.

criminal history which commenced when you were a juvenile. The instant offense occurred shortly after you were released from a 19-year prison sentence. Rather than chart a productive law-abiding course, you channeled back to your old ways using methamphetamine, acquiring a gun. Though you will most certainly disagree with this Court's sentencing, the simple fact is that you're a dangerous individual. Your removal from society is both mandated and necessary for public safety.

"After hearing Robert Scanlan speak and after having read Officer Davila's letter several times, it goes without saying that the physical and emotional harm to Officer Davila and Officer Scanlan are immeasurable.Fortunately these two victims have the support of their families, their law enforcement comrades, and the Fresno community as well.

"If Officer Davila was here I would tell her I was heartened by her strength.She has endured and continues to endure much emotional and physical pain.She declares that she will be strong, she will recover, and that I have no doubt.

"As for Officer Scanlan's family, it is this Court's sincere wish that Officer Scanlan improve and one day fully recover. I firmly believe in the power of prayer, and I know that most everyone who has been touched by this event will pray that Toamalama Scanlan get better.

"Officer Davila and Officer Scanlan spent their career serving and helping and protecting the people of this community, perhaps now the community can help and protect these two brave officers."

As explained above, defendant's aggregate sentence consisted of a determinate term of 20 years based on the prior serious felony enhancements, plus two consecutive indeterminate terms of 25 years to life for the firearm enhancements, and two consecutive indeterminate terms of life with the possibility of parole for the attempted murder convictions, with MEPDs of 21 years for each count pursuant to the Three Strikes law.

E.      *Analysis*

Defendant asserts the matter must be remanded because the court was not aware of the scope of its discretion as to the firearm enhancements, and defense counsel was prejudicially ineffective for failing to request dismissal of the enhancements in his sentencing motion. Defendant further asserts the court should have the opportunity to

decide whether to exercise that same discretion for the prior conviction enhancements since the amendments to section 667, subdivision (a) are retroactive. Defendant acknowledges the court "expressed concerns" about defendant's actions and the need for his incarceration, but argues remand is appropriate because it never stated the intent to impose the maximum possible term.

" '[W]hen the record shows that the trial court proceeded with sentencing on the … assumption it lacked discretion, remand is necessary so that the trial court may have the opportunity to exercise its sentencing discretion at a new sentencing hearing. [Citations.] Defendants are entitled to "sentencing decisions made in the exercise of the 'informed discretion' of the sentencing court," and a court that is unaware of its discretionary authority cannot exercise its informed discretion.' [Citation.] But if ' "the record shows that the trial court would not have exercised its discretion even if it believed it could do so, then remand would be an idle act and is not required." ' [Citation.]" (*People v. McDaniels, supra,* 22 Cal.App.5th at p. 425; *People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391; *People v. Almanza* (2018) 24 Cal.App.5th 1104, 1110.)

We find remand for possible resentencing on either the firearm or prior serious felony conviction enhancements would be an idle act based on the court's findings at the sentencing hearing. While defendant did not move to dismiss the firearm enhancements, he requested the court exercise its discretion to dismiss at least one prior strike conviction in order to receive a lesser sentence. In response, the court made detailed and extensive findings as to defendant's history, prior criminal convictions, recidivism, and criminal conduct that led to his convictions in this case. The court could "discern no compelling reason" that the imposition of a lesser sentence by dismissing a prior strike would be in furtherance of justice. The court found defendant's current offenses were "disturbing and tragic" but "not surprising" given his prior criminal conduct. "Though you will most certainly disagree with this Court's sentencing, the simple fact is that you're a dangerous

individual.  Your removal from society is both mandated and necessary for public safety."

Defendant contends the court did not indicate the intent to impose the longest possible sentence.  This assertion is refuted by defendant's sentence.  As explained in issue III, *ante*, as to both counts 1 and 2, the court imposed 20 years pursuant to the section 12022.53, subdivision (c) firearm enhancement, and stayed that term for both counts pursuant to section 12022.53, subdivision (f); it also stayed the 10-year term for the section 12022.5, subdivision (a) firearm enhancement.  The court was statutorily required to stay these enhancements.  (§ 12022.53, subd. (f); *People v. Gonzalez* (2008) 43 Cal.4th 1118, 1127–1130; *People v. Sinclair* (2008) 166 Cal.App.4th 848, 854.)

The court also stayed the terms and enhancements imposed for counts 3 and 4, assault with a firearm, consistent with the probation report's recommendation that the terms were subject to section 654 since his conduct for those two convictions was also the basis for counts 1 and 2.  It cannot be said that the court made these decisions based on any intent to impose a lesser sentence for defendant.

Defendant contends his case is similar to *People v. Billingsley* (2018) 22 Cal.App.5th 1076 (*Billingsley*), where the trial court was required to impose the firearm enhancements at the time of the sentencing hearing.  On appeal, the defendant argued the matter should be remanded because the subsequent amendments were retroactive, and the trial court should have the ability to decide whether to exercise its discretion and dismiss the firearm enhancements.  (*Id*. at pp. 1079–1080.)  *Billingsley* agreed with the defendant's argument and held remand was appropriate because the record did not " 'clearly indicate' the court would not have exercised discretion to strike the firearm allegations had the court known it had that discretion.  Although the trial court noted the facts of the case 'could have been a lot worse,' the court did not express an intention to impose the maximum possible sentence.  The court also expressed concern the

consequences for [the defendant's] sentence were 'unfortunate' and 'tragic.' [Citation.]" (*Id*. at p. 1081.)

*Billingsley* does not support defendant's arguments for remand since the trial court in this case made the opposite findings – that defendant was a "dangerous individual" and should be removed from society. The court did not express sympathy for defendant, but instead expressed concern and sympathy for Officers Davila and Scanlan and their families, and for the physical and emotional harm they had suffered from defendant's criminal conduct.

Defense counsel's failure to move to dismiss the firearm enhancements was not prejudicial, and "[t]he record in this case demonstrates with unusual clarity that remand would be an idle act. [Citation.]" (*People v. Flores* (2020) 9 Cal.5th 371, 432.)

## V.     Dr. Yufik's Testimony as the Defense Expert

As set forth above, Dr. Yufik testified as the defense expert and gave his opinion that, at the time of the shooting, defendant suffered from methamphetamine abuse, he was in a psychotic state induced by methamphetamine, and he lost touch with and was not able to accurately perceive reality. On cross-examination, the prosecutor asked Dr. Yufik about the secondary diagnosis listed in his report, and Dr. Yufik confirmed that he also diagnosed defendant with anti-social personality disorder.

Defendant contends his attorney was prejudicially ineffective for calling Dr. Yufik as the defense expert, because that resulted in the disclosure of his report to the prosecutor, who then used the report to cross-examine Dr. Yufik about his secondary diagnosis that defendant had antisocial personality disorder. Defendant argues his attorney failed to recognize he had "both the ability and the duty to bury an adverse expert report," and counsel's error was prejudicial because if he "had not given the prosecution Dr. Yufik's report or had Dr. Yufik testify, there is a reasonable probability that at least one juror" would have voted to acquit him of attempted murder.

## A. *Defendant's Motion to Introduce Dr. Yufik's Testimony*

Defendant's pretrial motion in limine sought to introduce Dr. Yufik's testimony that defendant's voluntary intoxication from methamphetamine use caused a mental defect. Defendant argued Dr. Yufik's testimony was admissible under section 29.4 and section 28 to establish that defendant "was suffering from a narcotic induced episode that altered his mental state at the time of the offense. The altered mental state caused by the voluntary intoxication of methamphetamine is evidence from which a jury can infer that [defendant] was incapable of forming the requisite malice necessary for attempt[ed] murder."

The People's responded that the scope of any potential psychiatric and psychological evidence for the defense was limited under sections 21 and 28, and defendant could not introduce opinion testimony on the ultimate question of whether he had a particular mental statement when he acted, including on his intent to kill, premeditation, deliberation, and malice aforethought.

The People also moved to exclude testimony from Dr. Yufik to the extent he relied on case-specific hearsay to diagnose defendant with an alleged amphetamine-type substance abuse disorder and antisocial personality disorder.

## B. *The Court's Ruling*

The court granted defendant's motion for Dr. Yufik to testify about the effect of methamphetamine on defendant's brain but held he could not address whether that prevented him from forming the requisite intent to commit the charged offenses. The court agreed with the prosecution that Dr. Yufik's testimony could be limited as to any case-specific hearsay evidence.

The court also held that "if there are other diagnosed mental health issues that [defendant] may have, I think Dr. Yufik would be able to discuss those, what they are, what they entail, and what they cause without giving the ultimate opinion."

79.

**C.** *The Trial Evidence*

As summarized in the factual statement, Dr. Yufik extensively testified on direct examination about defendant's substance abuse and methamphetamine addiction, his resulting paranoid, and that he was unable to determine reality at the time of the shooting.

On cross-examination, the prosecutor asked Dr. Yufik about his secondary diagnosis. Dr. Yufik testified the first diagnosis was amphetamine substance use disorder, and the second was antisocial personality disorder. In response to further cross-examination, Dr. Yufik testified that defendant had a history of conduct disorder issues in addition to his drug abuse.

**D.** *Ineffective Assistance – Tactical Decisions*

As noted above, in order to establish ineffective assistance of counsel, "defendant has the burden of proving that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and that there is a reasonable probability that, but for counsel's unprofessional errors, the result would have been different. [Citations.]" (*People v. Frierson, supra,* 53 Cal.3d at p. 747.)

A reviewing court "will indulge in a presumption that counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy. Defendant thus bears the burden of establishing constitutionally inadequate assistance of counsel. [Citations.]" (*People v. Gamache* (2010) 48 Cal.4th 347, 391.)

"If the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, an appellate claim of ineffective assistance of counsel must be rejected unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation. [Citation.]' [Citation.]" (*People v. Gamache, supra,* 48 Cal.4th at p. 391.)

"Counsel's primary 'duty is to investigate the facts of his client's case and to research the law applicable to those facts.' [Citation.] Counsel's decisions regarding

strategy and tactics must be rational and ' "founded upon adequate investigation and preparation." ' [Citation.]" (*People v. Doolin* (2009) 45 Cal.4th 390, 423.)

"The decision whether to call certain witnesses is a 'matter[] of trial tactics and strategy which a reviewing court generally may not second-guess.' [Citation.]" (*People v. Carrasco* (2014) 59 Cal.4th 924, 989.) " 'Tactical errors are generally not deemed reversible, and counsel's decisionmaking must be evaluated in the context of the available facts.' [Citation.]" (*People v. Weaver* (2001) 26 Cal.4th 876, 925–926.)

"Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. [Citation.] A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' [Citation.] There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way. [Citation.]" (*Strickland v. Washington* (1984) 466 U.S. 668, 689; *In re Valdez* (2010) 49 Cal.4th 715, 729–730.)

"[W]here counsel's trial tactics or strategic reasons for challenged decisions do not appear on the record, we will not find ineffective assistance of counsel on appeal unless there could be no conceivable reason for counsel's acts or omissions. [Citations.]" (*People v. Weaver*, *supra*, 26 Cal.4th at p. 926.)

### E. *Defendant's Arguments*

Defendant asserts that when Dr. Yufik returned his report to defense counsel about his examination, and it included the secondary diagnosis of antisocial personality disorder, counsel was prejudicially ineffective for still deciding to call him as the defense expert, which required disclosure of Dr. Yufik's report to the prosecution that contained that diagnosis. Once Dr. Yufik "produced a report calling [defendant] a sociopath and a pathological liar," defense counsel "had an affirmatively duty to keep it away from the prosecutor …."

While Dr. Yufik provided "some minimally helpful testimony about how methamphetamine use can cause people to become paranoid, his testimony about [defendant's] personality disorder provided the prosecutor powerful impeachment of [defendant's] testimony," the secondary diagnosis of antisocial personality disorder did not support or promote the defense, and instead it became "the heart" of the prosecutor's closing argument.

Defendant argues the defense could have called Dr. Yufik or another expert to generally testify about the effect of methamphetamine on a person and that it caused paranoia, instead of calling Dr. Yufik to testify about his examination and tests on defendant that resulted in his secondary diagnosis of antisocial personality disorder, and that would have prevented the prosecution from using that diagnosis "to destroy [defendant's] credibility."

Defendant asserts there was no strategic reason for defense counsel to call Dr. Yufik "[o]nce he saw his expert's report was filled with damaging information that would destroy his client's credibility," and instead counsel should have "declined to use the expert and should have declined to disclose the report."

Defendant asserts the credibility of his trial testimony was "really the only issue in the case," and counsel's decision to call Dr. Yufik "destroy[ed]" his defense and "fatally

undermined [his] credibility," and that decision constituted prejudicial ineffective assistance because it resulted in his conviction of the charged offenses.

### F. *Analysis*

#### 1. Counsel's Tactical Decision

We decline to find defense counsel was ineffective for making the strategic and tactical decision to call Dr. Yufik as the defense expert. Defense counsel was faced with the daunting task of explaining why defendant entered the jail's public lobby and shot two uniformed correctional officers in the head at point-blank range. In order to do so, counsel focused on the testimony from members of the public and law enforcement witnesses who mentioned defendant's strange behavior and repetitive statements, and tied that together with his positive methamphetamine test results to argue that defendant became paranoid and no longer knew what was real. It was reasonable for counsel to determine that Dr. Yufik's specific opinion, based on interviewing, examining, and testing defendant, was more effective than any generic testimony about the general impact of methamphetamine on a person.

It is possible that defense counsel may have consulted other experts, received similar opinions about the dual diagnosis of substance abuse and antisocial personality disorder, and done exactly what defendant asserts should have done with Dr. Yufik's report – declined to call them as witnesses to prevent disclosure of their reports. It is also possible that counsel may have learned from Dr. Yufik that the indicia of defendant's antisocial personality disorder was so apparent that other experts would reach the same secondary diagnosis for defendant.

The record strongly implies that defense counsel was well aware of Dr. Yufik's secondary diagnosis. In his pretrial motion, counsel moved to introduce Dr. Yufik's expert testimony. The prosecutor asked the court to limit the expert's testimony to the extent he relied on case-specific hearsay to diagnose defendant with an alleged amphetamine-type substance abuse disorder and anti-social personality disorder. The

court also held that "if there are other diagnosed mental health issues that [defendant] may have, I think Dr. Yufik would be able to discuss those, what they are, what they entail, and what they cause without giving the ultimate opinion."

When the prosecutor cross-examined Dr. Yufik on his secondary diagnosis of antisocial personality disorder, Dr. Yufik returned to defendant's substance abuse problems and testified that when such a person uses methamphetamine, the drug will exacerbate the symptoms of the disorder.

While defense counsel did not ask Dr. Yufik about the secondary diagnosis on direct examination, he was clearly ready to address the issue on redirect examination and asked Dr. Yufik to expand on his dual diagnoses. In response, Dr. Yufik testified that defendant had "very limited insight into the role that substance abuse and anti-social personality disorder has played in his life."

> "[Defense counsel]  Now, you mentioned – or the People mentioned this secondary diagnosis of anti-social personality disorder, correct?
>
> "A     Yes.
>
> "Q     Now, with respect to that, how does that impact the meth-induced paranoia that he was suffering?
>
> "A     *So the personality disorder is one particular diagnosis whereas I've indicated and [the prosecutor] pointed out, that a person really has this characterological way, this really pathological way of relating and seeing himself in other people.  How meth works is it exacerbates those underlying conditions.  So a person is impulsive this much, with meth they are impulsive that much more.  It exacerbates, makes those conditions even worse than they were before*."  (Italics added.)

Dr. Yufik testified there were no other diagnoses that would explain defendant's conduct that day.

In addition, the court granted the defense request to instruct with both CALCRIM No. 3426, voluntary intoxication, based on defendant's methamphetamine use; and CALCRIM No. 3428, mental impairment as a defense to specific intent or a mental state.

While the prosecutor cited Dr. Yufik's secondary diagnosis in closing argument, defense counsel used his own closing argument to rely on that diagnosis in support of the defense theory. Defense counsel cited Dr. Yufik's testimony that defendant's very intense paranoia was exacerbated by his antisocial personality disorder and argued his voluntary intoxication could be considered to determine if he acted with the specific intent to kill as to counts 1 and 2, attempted murder.

Based on this record, we cannot say defense counsel had no rational tactical or strategic reason to call Dr. Yufik as the defense expert. While some of Dr. Yufik's conclusions may have been damaging, counsel reasonably could have concluded the favorable aspects of the expert's opinions outweighed any damaging effect, supported the expert's opinions about the impact of his methamphetamine use, and furthered the defense theory that defendant had lost his grip on reality when he shot the two officers at point-blank range. The fact that counsel's tactical decision was not successful does not mean it constituted prejudicial ineffectiveness.

### 2. Prejudice

To the extent that defense counsel's decision was erroneous, we reject defendant's argument that Dr. Yufik's testimony was responsible for destroying the credibility of his trial testimony and his self-defense theory and resulted in his attempted murder convictions. To the contrary, defendant destroyed his credibility with his own inconsistent answers and claims that were undermined by every other witness who testified.

Defendant testified he had problems in school with gangs, but eventually admitted that he was a member of a criminal street gang. Defendant admitted he lied to Dr. Yufik about his lengthy history of methamphetamine use.

Defendant claimed that at the time of the shooting, he believed his girlfriend was setting him up to be assaulted by certain people, and these people were following him around. He admitted that after he dropped off his girlfriend that morning, he had three

cell phones with him and never used them to call law enforcement for help; he relied on the excuse that he could not get a cell phone signal after he parked by the police department, but failed to explain why he did not make a call before he drove there.

Defendant testified he first went to the police department, and then the jail, because he thought they would help him since he believed he was being followed by certain people. After reviewing video evidence, defendant conceded that when he walked from the police department to the jail, he passed police squad cars when he crossed the street but did not flag down or signal an officer that he was in trouble and needed help.

Defendant denied that he told Mrs. Preciada not to go in the jail, and only told her to leave him alone. Mrs. Preciada, called as a defense witness, testified defendant repeatedly told her not to go into the lobby shortly before he entered the public doors.

Defendant testified he went to the jail to turn himself in because he was afraid of the people who were allegedly following him. Defendant admitted that he never told Officer Hanlin or any of the officers that he was a parolee and carrying a gun, even though he knew that would have made him subject to arrest, because he was "still a member of the public" and did not want bring "all that up."

Defendant testified he approached the security counter, falsely told Officer Hanlin that he wanted to visit someone and lied so he could have some time to think about what to do. The prosecution introduced evidence, however, that defendant specifically asked to visit "Nhia Vang," and that person was a jail inmate at that time.

Defendant identified Lieutenant Porter by name and claimed that Porter crouched by the metal detector and fired at defendant before defendant shot either Officers Davila or Scanlan. It was undisputed, however, that Porter was the only correctional officer who carried a firearm that day, and no other witness placed Porter in the lobby until after defendant shot both officers.

Defendant testified that he "held my ground," took "defensive" actions, his "survival instincts kicked in," and he first shot Officer Davila and then Officer Scanlan

86.

because he believed his life was at risk since Lieutenant Porter had already shot at him. He admitted, however, that when Davila initially approached him in the lobby, he never asked for help, said people were allegedly following him, or advised her that he was a parolee who was illegally armed with a firearm.

Defendant claimed he raised his hands and tried to surrender after he fired his first shot into the window of the records door, and before he shot Officer Davila. Every other witness testified he never raised his hands until after he shot both officers, and after Lieutenant Porter had returned fire at him. Even when defendant finally raised his hands, he failed to comply with Porter's repeated orders to drop his gun.

By the end of his testimony, defendant admitted he intentionally shot both Officers Davila and Scanlan, he never saw Scanlan with a gun and recognized that he only had a yellow Taser, he aimed directly at Scanlan's face and fired because he knew Scanlan was wearing a bulletproof vest, and admitted he was the person who started everything that happened in the lobby that day.

We find that to the extent defense counsel should not have called Dr. Yufik, the error was not prejudicial given the overwhelming weight of the other evidence that thoroughly undermined defendant's claim that he shot both officers in either perfect or imperfect self-defense.

## VI.    Imposition of the Restitution Fine, Fees, and Assessments

At the sentencing hearing, the court imposed the statutory maximum restitution fine of $10,000 (§ 1202.4, subd. (b)) and suspended the parole revocation fine of $10,000 (§ 1202.45). It imposed victim restitution of $450 (§ 1202.4, subd. (f)) and reserved further victim restitution. It also imposed a court operations assessment of $40 (§ 1465.8), a criminal conviction assessment of $30 (Gov. Code, § 70373), and a $296 probation report fee. Defendant did not object to the fines and fees.

Defendant contends the matter must be remanded for the court to consider his ability to pay these amounts, consistent with *People v. Dueñas* (2019) 30 Cal.App.5th

87.

1157, which was decided after his sentencing hearing, and held, "due process of law requires the trial court to conduct an ability to pay hearing and ascertain a defendant's present ability to pay" before it imposes any fines or fees. (*Dueñas,* at pp. 1164, 1167.)[29]

While defendant was sentenced prior to the decision in *Dueñas*, the court imposed the statutory maximum restitution fine, and he had the incentive and statutory ability to object to that amount based upon an inability to pay. Subdivision (c) of section 1202.4 states that "[i]nability to pay may be considered *only* in increasing the amount of the restitution fine *in excess of the minimum fine* pursuant to paragraph (1) of subdivision (b)." (Italics added.) However, where only the statutory minimum is imposed, section 1202.4, subdivisions (b)(1) and (c) expressly prohibit consideration of a defendant's ability to pay.

As a result, many appellate courts have found forfeiture of an asserted inability to pay a maximum restitution fine where the appellant failed to object in the trial court. (*People v. Nelson* (2011) 51 Cal.4th 198, 227 [defendant forfeited challenge to $10,000 restitution fine imposed under section 1202.4 by failing to object at his sentencing hearing]; *People v. Taylor* (2019) 43 Cal.App.5th 390, 400–401 [defendant forfeited objection to $10,000 restitution fine]; *People v. Aviles* (2019) 39 Cal.App.5th 1055 [rejecting the defendant's futility argument where restitution fines above the statutory minimum were imposed].)

Since the restitution fine was set above the statutory minimum, the court was permitted to consider defendant's asserted inability to pay. (*People v. Taylor, supra*, 43 Cal.App.5th at pp. 399–400.) Consequently, by failing to object below, defendant has forfeited his assertion that the court failed to consider his ability to pay.

---

[29] The California Supreme Court is currently considering whether trial courts must consider a defendant's ability to pay before imposing or executing fines, fees, and assessments; and if so, which party bears the applicable burden of proof. (See *People v. Kopp* (2019) 38 Cal.App.5th 47, 94–98, review granted Nov. 13, 2019, S257844.)

As for the other fees and assessments, "[a]s a practical matter, if defendant chose not to object to the $10,000 restitution fine based on inability to pay, he surely would not complain on similar grounds regarding an additional [$70] in fees …. [Citation.]" (*People v. Jenkins*, *supra*, 40 Cal.App.5th at pp. 40–41; *People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1154.)

## DISPOSITION

The judgment is affirmed.

POOCHIGIAN, J.

WE CONCUR:

HILL, P.J.

SMITH, J.